_Michael D Millard_
Name

_7911 Morrow Ave NE_

_Albuquerque, NM 87110_
Address

**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAY **1 9** 2025

**MITCHELL R. ELFERS**
CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_Michael D Millard_ , Plaintiff
(Full Name)

v.

_U.S. Department_
_of Transportation_ , Defendant(s)

CASE NO. CV 25-468 GBW

(To be supplied by the Clerk)

CIVIL RIGHTS COMPLAINT
PURSUANT TO 42 U.S.C.§1983

## A.  JURISDICTION

1) _Michael Millard_ , is a citizen of _New Mexico_
   (Plaintiff)                                              ( State )

   who presently resides at _7911 Morrow Ave NE Albuquerque_
                            (Mailing address or place of confinement)

   _NM 87110_ .

2) Defendant _Sean Duffy_ is a citizen of
            (Name of first defendant)

   _Washington DC_ , and is employed as

   _Secretary of Transportation_ . At the time the claim(s)
   ( Position and title, if any)

   alleged in this complaint arose, was this defendant acting under color of state law?

   Yes ☒    No ☐    If your answer is "Yes", briefly explain:

   _Executed Executive Order 14286 to place drivers_
   _out-of-service per 49 Code of Federal Regulations 391.11(b)(2)_
   _violating 49 U.S. Code 521(b)(5)(A) and(B), whereas there's no_
   _"imminent hazard."_

XE-2    2/78    CIVIL RIGHTS COMPLAINT (42 U.S.C. §1983)

3) Defendant _____*None*_____ is a citizen of
          (Name of second defendant)

_____ , and is employed as
          (City, State)

_____ · At the time the claim(s)
          ( Position and title, if any)

alleged in this complaint arose, was this defendant acting under color of state.

Yes ☐   No ☐   If your answer is "Yes", briefly explain:

(Use the back of this page to furnish the above information for additional defendants.)

4) Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3), 42 U.S.C. §1983. (If you wish to assert Jurisdiction under different or additional statutes, you may list them below.)

## B.  NATURE OF THE CASE

1) Briefly state the background of your case.

49 Code of Federal Regulations (CFR) 391.11(b)(2) was in the North American Standard out-of Service (OOS) Criteria April 2005 until April 2015. 49 CFR 391.11(b)(2) requires commercial Motor Vehicle (CMV) drivers to read, speak, and write in English. 49 CFR 391.11(b)(2) was removed from the OOS Criteria for violation of the 14th Amendment as Spanish speaking officers, gave Spanish speaking drivers latitude, but not Polish, Punjabi, Russian, etc. drivers. Having ~~put~~ 49 CFR Part 391.11(b)(2) in the OOS Criteria is a violation of 49 U.S. Code 521(b)(5)(A) and (B) as it is not an "imminent hazard."

## C.  CAUSE OF ACTION

1) I allege that the following of my constitutional rights, privileges or immunities have been violated and that the following facts form the basis for my allegations: (If necessary, you may attach up to two additional pages (8 1/2" x 11") to explain any allegation or to list additional supporting facts.

A)(1)  Count I: Road side inspections ~~are not~~ to administer English test for compliance with 49 CFR Part 391.11(b)(2) are a violation of my 5th Amendment.

(2)  Supporting Facts: (Include all facts you consider important, including names of persons involved, places and dates. Describe exactly how each defendant is involved. State the facts clearly in your own words without citing leagl authority or argument.)

49 USC 521(b)(5)(A) requires a violation of the Federal Motor Carrier Safety Regulations (FMCSR) 49 CFR Part 350 through 399 to pose an "imminent hazard" as defined by 49 USC 521(b)(5)(B) for a driver to be placed out-of-service (OOS.)

B)(1)  Count II:

Drivers placed OOS for 49 CFR Part 391.11(b)(2) can have their equipment towed in violation of the 4th Amendment. 49 USC 521(b)(5)(A) requires a violation of the FMCSR to pose an "~~imminent~~ imminent

(2) Supporting Facts: hazard."

See attached packet.

XE-2 2/78                                           -3-

C)(1) Count III:

The Secretary of the U.S. Department of Transportation violated 49 US Code 322(b) by adopting the OOS Criteria via 49 CFR Part 385.4. The OOS Criteria is written by the Commercial Vehicle

(2) Supporting Facts: Safety Alliance a 503(c) non-profit organization.

The violation violates CMV drivers' 4th, 5th, and 14th Amendments.

See Attached packet

D) PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

1) Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action or otherwise relating to the conditions of your imprisonment? Yes ☐ No ☒ If your answer is "YES", describe each lawsuit. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

a) Parties to previous lawsuit.

Plaintiffs: _____N/A_____

Defendants: _____

b) Name of court and docket number:

c) Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?

d) Issues raised: _____

XE-2    2/78                — 4 —

e) Approximate date of filing lawsuit: _____

f) Approximate date of disposition: _____

2) I have previously sought informal or formal relief from the appropriate administrative officials regarding the acts complained of in Part C.  Yes ☐    No ☒    If your answer is "Yes", briefly describe how relief was sought and the results.  If your answer is "No," briefly explain why administrative relief was not sought.

E.    REQUEST FOR RELIEF

1) I believe that I am entitled to the following relief:

A.) Have 49 CFR 395.11(b)(2) removed from the OOS Criteria

B.) Have the OOS Criteria removed until the Secretary of Transportation follows 49 USC 521(b)(5)(A) and (B), 49 USC 302, 49 USC 322, and 5 USC 553

_____
Signature of Attorney (if any)

_____
Signature of Petitioner

Attorney's full address and telephone number.

XE-2    2/78                    - 5 -

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the plaintiff in the above action, that he has read the above complaint and that the information contained therein is true and correct. 28 U.S.C. Sec. 1746. 18 U.S.C. Sec. 1621.

Executed at _____ on _____ 20___
                        (Location)                              (Date)

                              _____
                                        (Signature)

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of New Mexico ▼

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. |
| Michael D. Millard ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| Defendant(s) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 19, 2025___ in the county of ___Bernalillo___ in the

___United States___ District of ___New Mexico___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 5 USC §533(b), 49 USC §302(b)(2), 49 USC §322(b), and §31136 | The Federal Motor Carrier Safety Administration a component of the US Department of Transportation (US DOT) adopting the North American Standard Out-of-Service Criteria without following the applicable United States Codes (USC.) |

This criminal complaint is based on these facts:
See attachments.

☑ Continued on the attached sheet.

_____
Complainant's signature

Michael D. Millard
Printed name and title

Sworn to before me and signed in my presence.

Date: _____

_____
Judge's signature

City and state: _____

_____
Printed name and title

United States of America vs Michael D. Millard May 19, 2025

1      The Federal Motor Carrier Safety Administration a component of the U.S.

2    Department of Transportation (DOT) per 49 Code of Federal Regulations (CFR) Part

3    §385.4(b) Matter Incorporated by Reference adopted (1) "***North American Standard Out-of-***

4    ***Service Criteria*** and Level VI Inspection Procedures and Out-of-Service Criteria for

5    Commercial Highway Vehicles Transporting Transuranics and Highway Route Controlled

6    Quantities of Radioactive Materials as defined in 49 CFR part 173.403," *April 1, 2024*;

7    incorporation by reference approved for § 385.415(b). These allegations are focused on the

8    "***North American Standard Out-of-Service*** (OOS) ***Criteria***" (OOS Criteria) and

9    drivers/vehicles placed OOS during roadside inspections, not out-of-service-orders (OOSO)

10   issued by DOT against carriers at their place of business.

11      The incorporation by reference impacts approximately 5.8 million drivers of

12   commercial motor vehicles (CMV) as defined by 49 USC §31132 and §31301. The April

13   2025 OOS Criteria has been modified to accommodate President Trump's Executive Order

14   14286 "Enforcing Commonsense Rules of the Road for America's Truck Drivers," and the

15   changes will impact the 5.8 million CMV drivers effective June 25, 2025. Section 3(b) of

16   President Trump's Executive Order 14286 "Enforcing Commonsense Rules of the Road for

17   America's Truck Drivers," requires DOT to add English to the OOS Criteria to reverse

18   "English Language Proficiency Testing and Enforcement Policy MC-ECE-2016-006" issued

19   June 14, 2016. 14 months after 49 CFR Part §391.11(b)(2) was removed from the 2015 OOS

20   Criteria.

21      "49 CFR Part §391.11 General qualification of drivers. (b) Except as provided in

22   subpart G of this part, a person is qualified to drive a motor vehicle if he/she— (2) Can read

23   and speak the English language sufficiently to converse with the general public, to

24   understand highway traffic signs and signals in the English language, to respond to official

25   inquiries, and to make entries on reports and records."

26      49 CFR Part §391.11(b)(2) was in the OOS Criteria April 2005 until April 2015. 49

27   CFR Part §391.11(b)(2) was removed per an article in Transport Topics by Eric Miller Staff

28   Reporter published March 16, 2015; "***Keppler said the language requirement was removed***

29   ***this year because lacking command of a language does not create an "imminent hazard"***

30   ***or place a driver in "imminent danger of a crash.***"

31   Removing 49 CFR Part §391.11(b)(2) from the OOS Criteria met the requirements of

32 49 USC §521(b)(5)(A); whereas, DOT has no regulation or evidence to substantiate that not

33 reading, writing, or speaking English meets the requirements of;

34   "49 USC §521(b)(5)(B) *In this paragraph, "imminent hazard" means any*

35 *condition of vehicle, employee, or commercial motor vehicle operations which*

36 *substantially increases the likelihood of serious injury or death if not discontinued*

37 *immediately."*

38   Having 49 CFR Part §391.11(b)(2) in the OOS Criteria from April 1, 2005 until

39 March 31, 2014 violated 49 USC §521(b)(5)(A) and (B) as there was no evidence to

40 substantiate that a driver's inability to speak, read, or write English created an "imminent

41 treat" that substantially increased the likelihood of serious injury or death.

42   May 12, 2003; Federal Register; Volume 68; Number 142; 49 CFR Part 391 [Docket

43 Number FMCSA 1997-2759]; RIN 2126-AA31 (Formerly RIN 2125-AE19); English

44 Language Requirements Qualification of Drivers withdrawal indicates the DOT didn't see

45 English skills as an imminent threat making it unclear why 49 CFR Part §391.11(b)(2) was

46 added to the OOS Criteria April 1, 2005.

47   The OOS is published by the Commercial Motor Vehicle Safety Alliance (CVSA) a

48 503(c) non-profit organization whose members are primarily the state law enforcement

49 officers that collect data for the DOT per 49 USC §31102 Motor carrier safety assistance

50 program (MCSAP.)

51   It is alleged the adoption of the OOS violates 5 USC §553 Rule Making document not

52 open to public comment via the Federal Register; 49 USC §302(b) Congress did not approve

53 adoption of "criteria"; 49 USC §322(a) General powers DOT can only delegate "*duties and*

54 *powers to an officer or employee of the Department.*;" and 49 USC §31136(c) United States

55 Government regulations requires DOT (c) Procedures and Considerations requires a

56 regulation to follow section 553 of 5 USC.

57   DOT cannot delegate its authority to identify an "imminent hazard" as identified by

58 49 USC §521(b)(5)(A) and (B) to an entity that's not an officer or employee of DOT per 49

59 USC §322(a); therefore, DOT not CVSA should publish the OOS Criteria.

60

61

United States of America vs Michael D. Millard May 19, 2025

62    The English issue in 49 CFR Part §391.11(b)(2) applies to CMV drivers as defined by
63    49 USC §31132, the short answer is 10,001 pounds or more in interstate commerce.  In 2022
64    DOT reported 5.8 million total drivers subject to 49 CFR Part §391.11(b)(2.)  For 49 CFR
65    Part 383.133(c)(5) that requires the commercial driver's license (CDL) skills test in English
66    with no interpreter a CMV is defined by 49 USC §31301 or 26,001 pounds or more.

67    **49 CFR § 383.133 Test methods.**  (c) Skills tests:  (5) Interpreters are prohibited
68    during the administration of skills tests. Applicants must be able to understand and respond to
69    verbal commands and instructions in English by a skills test examiner. Neither the applicant
70    nor the examiner may communicate in a language other than English during the skills test.

71    **49 CFR § 384.307 FMCSA program reviews of State compliance.** (a) FMCSA
72    Program Reviews.  Each State's CDL program will be subject to review to determine whether
73    or not the State meets the general requirement for substantial compliance in § 384.301. The
74    State must cooperate with the review and provide any information requested by the FMCSA.

75    **49 CFR § 384.401 Withholding of funds based on noncompliance.** (a) Following
76    the first year of noncompliance.  An amount up to 4 percent of the Federal-aid highway funds
77    required to be apportioned to any State under 23 U.S.C. 104(b)(1) and (2) shall be withheld
78    from a State on the first day of the fiscal year following such State's first year of
79    noncompliance under this part.

80    It is fundamentally wrong to place all the burden of English-speaking drivers on the
81    carriers' shoulders.  Since 2011 49 CFR Part §383.133(c)(5) has required the CDL skills test
82    to be administered in English without an interpreter.  DOT and its state CDL partners have
83    neglected to test CMV drivers in English or there would be approximately 4.172 million
84    CDL holders that speak English proficiently.  Since 2015 there has not been an English
85    proficiency test developed.  From 2005 to 2015 there were issues with Spanish speaking
86    officers gave Spanish speaking drivers latitude, however, Polish, Russian, Punjabi, etc.
87    speaking drivers weren't afforded the same latitude.  DOT's inaction has caused a situation
88    warranting President Trump's action.

89

90

91

United States of America vs Michael D. Millard May 19, 2025

92          To demonstrate the range of confusion and misuse of the CVSA as a legal reference in
93  United States v. Marzett Parker, Court of Appeals for the Eighth Circuit 10/16/2009 Docket
94  Number: 08-2883 it was argued: "*2 The Commercial Vehicle Safety Alliance authorizes officers*
95  *such as Officer Wilkins to enforce federal motor vehicle laws by checking licenses, logbooks,*
96  *insurance, etc. See Commercial Vehicle Safety Alliance, North American Standard Inspection*
97  *Levels [hereinafter NAISP Levels], http://www.cvsa.org/ programs/nas_levels.aspx (last visited*
98  *Oct. 5, 2009); see also 49 C.F.R. § 350.105.*"  Where does the CVSA garner authority to
99  authorize officers to conduct CMV inspections?  The officer was granted the authority to inspect
100  the CMV by *Revisor of Missouri Title XIX Motor Vehicle, Watercraft and Aviation, Chapter*
101  *304.230 Enforcement of load laws – commercial vehicle inspectors, powers,* not the CVSA.
102          DOT has not established that a driver's English speaking, writing, and reading skills are
103  an imminent hazard as required by 49 USC §521(b)(5)(A) and (B), therefore, a driver cannot be
104  placed OOS during a roadside inspection.
105          The OOS Criteria is not published by DOT, its reference in 49 CFR Part §385.4 violates 5
106  USC §553; 49 USC §302; 49 USC §322; and 49 USC §31136.  English should be blocked from
107  the OOS Criteria as it doesn't meet the "imminent danger" threshold established by 49 USC
108  §521(b)(5)(A) and (B), and the OOS Criteria should be removed from CVSA and fall under the
109  DOT.  If CVSA retains the rights to the OOS Criteria the DOT should develop a roadside
110  inspection process per 49 USC §31102(O)(iii) and list of OOS violations per 49 USC
111  §521(b)(5)(A) and (B.)
112          OOS violations impact motor carriers Compliance Safety Accountability (CSA) scores
113  DOT utilizes to evaluate carriers' safety management.  OOS violations carry a greater impact on
114  the severity of a violation.  Depending on whether a violation is cited as non-OOS or as OOS the
115  same CFR carries a different value if marked as OOS.
116
117
118
119
120
121

United States of America vs Michael D. Millard May 19, 2025

122        The OOS Criteria *limits the scope* of the Federal Motor Carrier Safety Regulations;

123    whereas it allows vehicles to operate when there are safety defects present:

124        **49 CFR Part § 393.1 Scope of the rules in this part.** (c) *No motor carrier may operate*

125    a commercial motor vehicle, or cause or permit such vehicle to be operated, unless it is equipped

126    in accordance with the requirements and specifications of this part.

127        **49 CFR Part § 396.3 Inspection, repair, and maintenance.** (a) (1) Parts and accessories

128    shall be in safe and proper operating condition *at all times*. These include those specified in part

129    393 of this subchapter and any additional parts and accessories which may affect safety of

130    operation, including but not limited to, frame and frame assemblies, suspension systems, axles

131    and attaching parts, wheels and rims, and steering systems.

132        The OOS Criteria should be reviewed by DOT to ensure it meets the standards of 49 USC

133    §521(b)(5)(A) and (B.)

134        DOT has delegated too much responsibility to CVSA, the public/trucking industry has

135    zero input on how roadside inspections are performed or which violations are OOS.

136

137    Attachments:

138

139

140

141

142

143

144

145

146

147

148

149

150

151

152

153

154  **Index of Exhibits:**

155  **Exhibit 1: 5 USC §553 Rule making** ……………………………………… **Pages 7 & 8**

156  **Exhibit 2:** 49 USC §302. Policy standards for transportation…………… Pages 9 & 10

157  **Exhibit 3:** 49 USC §322. General powers ………………………………… Pages 11 - 13

158  **Exhibit 4: 49 USC §351. Judicial review of actions in carrying out**

159      **certain transferred duties and powers** ……………………… **Pages 14 & 15**

160  **Exhibit 5: 49 USC §352. Authority to carry out certain transferred**

161      **duties and powers** ……………………………………………… **Pages 16 & 17**

162  **Exhibit 6: 49 USC §521. Civil penalties** ……………………………… **Pages 18 - 25**

163  **Exhibit 7: 49 USC §31301. Definitions** ……………………………… **Pages 26 & 27**

164  **Exhibit 8: 49 USC §31102. Motor carrier safety assistance program** …… **Pages 28 - 41**

165  **Exhibit 9: 49 USC §31132. Definitions** …………………………………... **Pages 42 - 44**

166  **Exhibit 10:** 49 USC §31136. United States Government regulations …….. Pages 45 - 47

167  **Exhibit 11: President Trump's Executive Order 14286 Enforcing**

168      **Commonsense Rules of the Road for America's Truck Drivers.. Pages 48 - 52**

169  **Exhibit 12: English Language Proficiency Testing and Enforcement Policy**

170      **MC-ECE-2016-006" issued June 14, 2016**………………………… **Pages 53 - 56**

171  **Exhibit 13: May 12, 2003; Federal Register; Volume 68; Number 142;**

172      **49 CFR Part 391 [Docket Number FMCSA 1997-2759];**

173      **RIN 2126-AA31 (Formerly RIN 2125-AE19); English Language**

174      **Requirements Qualification of Drivers withdrawal** ……………… **Pages 57 - 60**

175  **Exhibit 14: March 16, 2015, article from Transport Topics CVSA Removes**

176      **English Requirement in Updated Out-of-Service Guidelines**…….. **Pages 61 - 64**

177  **Exhibit 15: SMS CSA snapshot identifying OOS violations and impact on**

178      **carrier's score** ………………………………………………….. **Pages 65 - 68**

179  **Exhibit 16: CSA SMS Methodology** ……………………………………… **Pages 69 - 72**

180  **Exhibit 17: DOT CDL Demographics** …………………………………… **Pages 73 & 74**

181  **Exhibit 18: Large truck & bus pocket guide** …………………………… **Pages 75 - 78**

182  **Exhibit 19: 2004 DOT Information 11 million CDL holders 3.0 to 3.3 million**

183      **CDL jobs**………………………………………………………… **Pages 79 & 80**

184  **Exhibit 20: OOS Criteria**………………………………………………… **Pages 81 - 88**

United States of America vs Michael D. Millard May 19, 2025

185
186
187
188
189
190
191
192
193

# Exhibit 1:
# 5 USC §553. Rule Making

194
195
196
197
198
199
200
201
202
203
204
205

United States of America vs Michael D. Millard May 19, 2025

206 • **5 USC §553. Rule making**
207 • (a) This section applies, according to the provisions thereof, except to the extent that there is
208   involved-
209 • (1) a military or foreign affairs function of the United States; or
210 • (2) a matter relating to agency management or personnel or to public property, loans, grants,
211   benefits, or contracts.
212 • (b) General notice of proposed rule making shall be published in the Federal Register, unless
213   persons subject thereto are named and either personally served or otherwise have actual
214   notice thereof in accordance with law. The notice shall include-
215 • (1) a statement of the time, place, and nature of public rule making proceedings;
216 • (2) reference to the legal authority under which the rule is proposed;
217 • (3) either the terms or substance of the proposed rule or a description of the subjects and
218   issues involved; and
219 • (4) the Internet address of a summary of not more than 100 words in length of the proposed
220   rule, in plain language, that shall be posted on the Internet website under section 206(d) of
221   the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).
222 • Except when notice or hearing is required by statute, this subsection does not apply-
223 • (A) to interpretative rules, general statements of policy, or rules of agency organization,
224   procedure, or practice; or
225 • (B) when the agency for good cause finds (and incorporates the finding and a brief statement
226   of reasons therefor in the rules issued) that notice and public procedure thereon are
227   impracticable, unnecessary, or contrary to the public interest.
228 • (c) After notice required by this section, the agency shall give interested persons an
229   opportunity to participate in the rule making through submission of written data, views, or
230   arguments with or without opportunity for oral presentation. After consideration of the
231   relevant matter presented, the agency shall incorporate in the rules adopted a concise general
232   statement of their basis and purpose. When rules are required by statute to be made on the
233   record after opportunity for an agency hearing, sections 556 and 557 of this title apply
234   instead of this subsection.
235 • (d) The required publication or service of a substantive rule shall be made not less than 30
236   days before its effective date, except-
237 • (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
238 • (2) interpretative rules and statements of policy; or
239 • (3) as otherwise provided by the agency for good cause found and published with the rule.
240

241

242

243

244

245

United States of America vs Michael D. Millard May 19, 2025

246

247

248

249

250

251

252

253

254

255

256

257

258

259

# Exhibit 2:

# 49 USC §302. Policy standards for transportation

United States of America vs Michael D. Millard May 19, 2025

260 • **49 USC §302. Policy standards for transportation**

261 • (a) The Secretary of Transportation is governed by the transportation policy of sections
262 10101 and 13101 of this title in addition to other laws.

263 • ***(b) This subtitle and chapters 221 and 315 of this title do not authorize, without***
264 ***appropriate action by Congress, the adoption, revision, or implementation of a***
265 ***transportation policy or investment standards or criteria.***

266 • (c) The Secretary shall consider the needs-

267 • (1) for effectiveness and safety in transportation systems; and

268 • (2) of national defense.

269 • (d)(1) It is the policy of the United States to promote the construction and commercialization
270 of high-speed ground transportation systems by-

271 • (A) conducting economic and technological research;

272 • (B) demonstrating advancements in high-speed ground transportation technologies;

273 • (C) establishing a comprehensive policy for the development of such systems and the
274 effective integration of the various high-speed ground transportation technologies; and

275 • (D) minimizing the long-term risks of investors.

276 • (2) It is the policy of the United States to establish in the shortest time practicable a United
277 States designed and constructed magnetic levitation transportation technology capable of
278 operating along Federal-aid highway rights-of-way, as part of a national transportation
279 system of the United States.

280 • (e) Intermodal Transportation.-It is the policy of the United States Government to encourage
281 and promote development of a national intermodal transportation system in the United States
282 to move people and goods in an energy-efficient manner, provide the foundation for
283 improved productivity growth, strengthen the Nation's ability to compete in the global
284 economy, and obtain the optimum yield from the Nation's transportation resources.

285 • **NOTE: Is §302(b) applicable to the OOS Criteria?**

286

287

288

289

290

291

292

293

294

# Exhibit 3:

# 49 USC §322 General Powers

295

296

297

298

299

300

301

302

303

304

305

United States of America vs Michael D. Millard May 19, 2025

306 • **49 USC §322. General powers**

307 • (a) The Secretary of Transportation may prescribe regulations to carry out the duties and

308    powers of the Secretary. An officer of the Department of Transportation may prescribe

309    regulations to carry out the duties and powers of the officer.

310 • (b) The Secretary may delegate, and authorize successive delegations of, ***duties and powers***

311    ***of the Secretary to an officer or employee of the Department.*** An officer of the Department

312    may delegate, and authorize successive delegations of, duties and powers of the officer to

313    another officer or employee of the Department. However, the duties and powers specified in

314    sections 103(c)(1),[1] 104(c)(1), and 106(g)(1) [1] of this title may not be delegated to an officer

315    or employee outside the Administration concerned.

316 • (c) On a reimbursable basis when appropriate, the Secretary may, in carrying out aviation

317    duties and powers-

318 • (1) use the available services, equipment, personnel, and facilities of other civilian or military

319    departments, agencies, and instrumentalities of the United States Government, with their

320    consent;

321 • (2) cooperate with those departments, agencies, and instrumentalities in establishing and

322    using aviation services, equipment, and facilities of the Department; and

323 • (3) confer and cooperate with, and use the services, records, and facilities of, State, territorial,

324    municipal, and other agencies.

325 • (d) The Secretary may make expenditures to carry out aviation duties and powers, including

326    expenditures for-

327 • (1) rent and personal services;

328 • (2) travel expenses;

329 • (3) office furniture, equipment, supplies, lawbooks, newspapers, periodicals, and reference

330    books, including exchanges;

331 • (4) printing and binding;

332 • (5) membership in and cooperation with domestic or foreign organizations related to, or a

333    part of, the civil aeronautics industry or the art of aeronautics;

334 • (6) payment of allowances and other benefits to employees stationed in foreign countries to

335    the same extent authorized for members of the Foreign Service of comparable grade;

United States of America vs Michael D. Millard May 19, 2025

336 • (7) investigations and studies about aeronautics; and
337 • (8) acquiring, exchanging, operating, and maintaining passenger-carrying aircraft and
338    automobiles and other property.
339 • (e) The Secretary may negotiate, without advertising, the purchase of technical or special
340    property related to air navigation when the Secretary decides that-
341 • (1) making the property would require a substantial initial investment or an extended period
342    of preparation; and
343 • (2) procurement by advertising would likely result in additional cost to the Government by
344    duplication of investment or would result in duplication of necessary preparation that would
345    unreasonably delay procuring the property.
346 • **NOTE: §322(b) did the FMCSA have the jurisdiction to accept the OOS Criteria that limits**
347    **the scope of the FMCSR?**
348
349
350
351
352
353
354
355
356
357
358
359
360
361
362
363
364
365
366

367

368

369

370

371

372

373

374

375

376

377
378
379
380
381
382
383
384
385
386
387
388

# Exhibit 4: 49 USC §351.

# Judicial review of actions in carrying out

# certain transferred

# duties and powers

United States of America vs Michael D. Millard May 19, 2025

389 • **49 USC §351. Judicial review of actions in carrying out certain transferred duties and**
390 **powers**

391 • (a) Judicial Review.-An action of the Secretary of Transportation in carrying out a duty or
392 power transferred under the Department of Transportation Act (Public Law 89–670, 80 Stat.
393 931), or an action of the Administrator of the Federal Railroad Administration, the *Federal*
394 *Motor Carrier Safety Administration,* or the Federal Aviation Administration in carrying out
395 a duty or power *specifically assigned to the Administrator by that Act*, *may be reviewed*
396 *judicially to the same extent and in the same way as if the action had been an action by the*
397 *department, agency, or instrumentality of the United States Government carrying out the*
398 *duty or power immediately before the transfer or assignment.*

399 • (b) Application of Procedural Requirements.-A statutory requirement related to notice, an
400 opportunity for a hearing, action on the record, or administrative review that applied to a duty
401 or power transferred by the Act applies to the Secretary or Administrator when carrying out
402 the duty or power.

403 • (c) Nonapplication.-This section does not apply to a duty or power transferred from the
404 Interstate Commerce Commission to the Secretary under section 6(e)(1)–(4) and (6)(A) of
405 the Act.

406
407
408
409
410
411
412
413
414
415
416
417
418
419

United States of America vs Michael D. Millard May 19, 2025

420

421

422

423

424

425

# Exhibit 5: 49 USC §352. Authority to carry out certain transferred duties and powers

428

429

430

431

432

433

434

435

United States of America vs Michael D. Millard May 19, 2025

436   • **49 USC §352. Authority to carry out certain transferred duties and powers**

437   • ***In carrying out a duty or power transferred under the Department of Transportation Act***

438   ***(Public Law 89–670, 80 Stat. 931)***, the Secretary of Transportation and the Administrators of

439   the Federal Railroad Administration, the *Federal Motor Carrier Safety Administration*, and

440   the Federal Aviation Administration *have the same authority that was vested in the*

441   *department, agency, or instrumentality of the United States Government carrying out the*

442   *duty or power immediately before the transfer.* An action of the Secretary or Administrator

443   in carrying out the duty or power has the same effect as when carried out by the department,

444   agency, or instrumentality.

445   • **NOTE:** §351 nor §352 grant the DOT or FMCSA additional jurisdiction, just the ability to

446   take legal actions as if one-in-the-same.

447

448

449

450

451

452

453

454

455

456

457

458

459

460

461

462

463

464

465

466

United States of America vs Michael D. Millard May 19, 2025

467

468

469

470

471

472

473

474

475

476

# Exhibit 6:

477

## 49 USC §521. Civil penalties

478

479

480

481

482

483

484

485

486

487

488

489

490

491

492

493

494

United States of America vs Michael D. Millard May 19, 2025

495 • **49 USC §521. Civil penalties**

496 • (a)(1) A person required under section 504 of this title to make, prepare, preserve, or submit
497 to the Secretary of Transportation a record about rail carrier transportation, that does not
498 make, prepare, preserve, or submit that record as required under that section, is liable to the
499 United States Government for a civil penalty of $500 for each violation.

500 • (2) A rail carrier, and a lessor, receiver, or trustee of that carrier, violating section 504(c)(1)
501 of this title, is liable to the Government for a civil penalty of $100 for each violation.

502 • (3) A rail carrier, a lessor, receiver, or trustee of that carrier, a person furnishing cars or
503 protective service against heat or cold, and an officer, agent, or employee of one of them,
504 required to make a report to the Secretary or answer a question, that does not make a report
505 to the Secretary or does not specifically, completely, and truthfully answer the question, is
506 liable to the Government for a civil penalty of $100 for each violation.

507 (4) A separate violation occurs for each day a violation under this subsection continues.

508 • (5) Trial in a civil action under this subsection is in the judicial district in which the rail
509 carrier has its principal operating office or in a district through which the railroad of the rail
510 carrier runs.

511 • (b) Violations Relating to Commercial Motor Vehicle Safety Regulation and Operators.-

512 • (1) Notice.-

513 • (A) In general.-If the Secretary finds that a violation of a provision of subchapter III
514 of chapter 311 (except sections 31138 and 31139) or section 31302, 31303, 31304, 31305(b),
515 31310(g)(1)(A),[1] or 31502 of this title, or a violation of a regulation issued under any of
516 those provisions, has occurred, the Secretary shall issue a written notice to the violator. Such
517 notice shall describe with reasonable particularity the nature of the violation found and the
518 provision which has been violated. The notice shall specify the proposed civil penalty, if any,
519 and suggest actions which might be taken in order to abate the violation. The notice shall
520 indicate that the violator may, within 15 days of service, notify the Secretary of the violator's
521 intention to contest the matter. In the event of a contested notice, the Secretary shall afford
522 such violator an opportunity for a hearing, pursuant to section 554 of title 5, following which
523 the Secretary shall issue an order affirming, modifying, or vacating the notice of violation.

524 • (B) Nonapplicability to reporting and recordkeeping violations.-Subparagraph (A) shall not
525 apply to reporting and recordkeeping violations.

United States of America vs Michael D. Millard May 19, 2025

526    • (2) Civil Penalty.-

527    • (A) In general.-Except as otherwise provided in this subsection, any person who is

528      determined by the Secretary, after notice and opportunity for a hearing, to have committed an

529      act that is a violation of regulations issued by the Secretary under subchapter III of chapter

530      311 (except sections 31138 and 31139) or section 31502 of this title shall be liable to the

531      United States for a civil penalty in an amount not to exceed $10,000 for each offense.

532      Notwithstanding any other provision of this section (except subparagraph (C)), no civil

533      penalty shall be assessed under this section against an employee for a violation in an amount

534      exceeding $2,500.

535    • (B) Recordkeeping and reporting violations.-A person required to make a report to the

536      Secretary, answer a question, or make, prepare, or preserve a record under section 504 of this

537      title or under any regulation issued by the Secretary pursuant to subchapter III of chapter

538      311 (except sections 31138 and 31139) or section 31502 of this title about transportation by

539      motor carrier, motor carrier of migrant workers, or motor private carrier, or an officer, agent,

540      or employee of that person-

541    • (i) who does not make that report, does not specifically, completely, and truthfully answer

542      that question in 30 days from the date the Secretary requires the question to be answered, or

543      does not make, prepare, or preserve that record in the form and manner prescribed by the

544      Secretary, shall be liable to the United States for a civil penalty in an amount not to exceed

545      $1,000 for each offense, and each day of the violation shall constitute a separate offense,

546      except that the total of all civil penalties assessed against any violator for all offenses related

547      to any single violation shall not exceed $10,000; or

548    • (ii) who knowingly falsifies, destroys, mutilates, or changes a required report or record,

549      knowingly files a false report with the Secretary, knowingly makes or causes or permits to be

550      made a false or incomplete entry in that record about an operation or business fact or

551      transaction, or knowingly makes, prepares, or preserves a record in violation of a regulation

552      or order of the Secretary, shall be liable to the United States for a civil penalty in an amount

553      not to exceed $10,000 for each violation, if any such action can be shown to have

554      misrepresented a fact that constitutes a violation other than a reporting or recordkeeping

555      violation.

United States of America vs Michael D. Millard May 19, 2025

556 • (C) Violations pertaining to CDLs.-Any person who is determined by the Secretary, after
557   notice and opportunity for a hearing, to have committed an act which is a violation of section
558   31302, 31303, 31304, 31305(b), or 31310(g)(1)(A) of this title shall be liable to the United
559   States for a civil penalty not to exceed $2,500 for each offense.

560 • (D) Determination of amount.-The amount of any civil penalty, and a reasonable time for
561   abatement of the violation, shall by written order be determined by the Secretary, taking into
562   account the nature, circumstances, extent, and gravity of the violation committed and, with
563   respect to the violator, the degree of culpability, history of prior offenses, effect on ability to
564   continue to do business, and such other matters as justice and public safety may require. In
565   each case, the assessment shall be calculated to induce further compliance.

566 • (E)(i) Copying of records and access to equipment, lands, and buildings.-A person subject
567   to chapter 51 or a motor carrier, broker, freight forwarder, or owner or operator of a
568   commercial motor vehicle subject to part B of subtitle VI who fails to allow promptly, upon
569   demand, the Secretary (or an employee designated by the Secretary) to inspect and copy any
570   record or inspect and examine equipment, lands, buildings and other property in accordance
571   with sections 504(c), 5121(c), and 14122(b) shall be liable to the United States for a civil
572   penalty not to exceed $1,000 for each offense. Each day the Secretary is denied the right to
573   inspect and copy any record or inspect and examine equipment, lands, buildings and other
574   property shall constitute a separate offense, except that the total of all civil penalties against
575   any violator for all offenses related to a single violation shall not exceed $10,000. In the case
576   of a motor carrier, the Secretary may also place the violator's motor carrier operations out of
577   service. It shall be a defense to a penalty that the records did not exist at the time of the
578   Secretary's request or could not be timely produced without unreasonable expense or effort.
579   Nothing in this subparagraph amends or supersedes any remedy available to the Secretary
580   under section 502(d), section 507(c), or any other provision of this title.

581 • (ii) *Place out of service.-The Secretary may by regulation adopt procedures for placing out*
582   *of service the commercial motor vehicle of a foreign-domiciled motor carrier that fails to*
583   *promptly allow the Secretary to inspect and copy a record or inspect equipment, land,*
584   *buildings, or other property.*

585

United States of America vs Michael D. Millard May 19, 2025

586 • (F) Penalty for violations relating to out of service orders.-A motor carrier or employer (as
587    defined in section 31132) that operates a commercial motor vehicle in commerce in violation
588    of a prohibition on transportation under section 31144(c) of this title or an imminent hazard
589    out of service order issued under subsection (b)(5) of this section or section 5121(d) of this
590    title shall be liable for a civil penalty not to exceed $25,000.

591 • (3) The Secretary may require any violator served with a notice of violation to post a copy of
592    such notice or statement of such notice in such place or places and for such duration as the
593    Secretary may determine appropriate to aid in the enforcement of subchapter III of chapter
594    311 (except sections 31138 and 31139) or section 31302, 31303, 31304, 31305(b), or 31502
595    of this title, as the case may be.

596 • (4) Such civil penalty may be recovered in an action brought by the Attorney General on
597    behalf of the United States in the appropriate district court of the United States or, before
598    referral to the Attorney General, such civil penalty may be compromised by the Secretary.

599 • (5)(A) If, upon inspection or investigation, the Secretary determines that *a violation of a*
600    *provision of subchapter III of chapter 311 (except sections 31138 and 31139) or section*
601    *31302, 31303, 31304, 31305(b), or 31502 of this title or a regulation issued under any of*
602    *those provisions, or combination of such violations, poses an imminent hazard to safety,*
603    *the Secretary shall order a vehicle or employee operating such vehicle out of service, or*
604    *order an employer to cease all or part of the employer's commercial motor vehicle*
605    *operations.* In making any such order, the Secretary shall impose no restriction on any
606    employee or employer beyond that required to abate the hazard. Subsequent to the issuance
607    of the order, opportunity for review shall be provided in accordance with *section 554 of title*
608    *5,* except that such review shall occur not later than 10 days after issuance of such order.

609 • (B) In this paragraph, "imminent hazard" means any condition of vehicle, employee, or
610    commercial motor vehicle operations which substantially increases the likelihood of
611    serious injury or death if not discontinued immediately.

612

613

614

615

616

United States of America vs Michael D. Millard May 19, 2025

617    • (6) Criminal Penalties.-

618    • (A) In general.-Any person who knowingly and willfully violates any provision of

619      subchapter III of chapter 311 (except sections 31138 and 31139) or section 31502 of this

620      title, or a regulation issued under any of those provisions shall, upon conviction, be subject

621      for each offense to a fine not to exceed $25,000 or imprisonment for a term not to exceed one

622      year, or both, except that, if such violator is an employee, the violator shall only be subject to

623      penalty if, while operating a commercial motor vehicle, the violator's activities have led or

624      could have led to death or serious injury, in which case the violator shall be subject, upon

625      conviction, to a fine not to exceed $2,500.

626    • (B) Violations pertaining to CDLs.-Any person who knowingly and willfully violates-

627    • (i) any provision of section 31302, 31303(b) or (c), 31304, 31305(b), or 31310(g)(1)(A) of

628      this title or a regulation issued under such section, or

629    • (ii) with respect to notification of a serious traffic violation as defined under section 31301 of

630      this title, any provision of section 31303(a) of this title or a regulation issued under section

631      31303(a), shall, upon conviction, be subject for each offense to a fine not to exceed $5,000 or

632      imprisonment for a term not to exceed 90 days, or both.

633    • (7) The Secretary shall issue regulations establishing penalty schedules designed to induce

634      timely compliance for persons failing to comply promptly with the requirements set forth in

635      any notices and orders under this subsection.

636    • (8) Prohibition on operation in interstate commerce after nonpayment of penalties.-

637    • (A) In general.-An owner or operator of a commercial motor vehicle against whom a civil

638      penalty is assessed under this chapter or chapter 51, 149, or 311 of this title and who does not

639      pay such penalty or fails to arrange and abide by an acceptable payment plan for such civil

640      penalty may not operate in interstate commerce beginning on the 91st day after the date

641      specified by order of the Secretary for payment of such penalty. This paragraph shall not

642      apply to any person who is unable to pay a civil penalty because such person is a debtor in a

643      case under chapter 11 of title 11, United States Code.

644    • (B) Regulations.-Not later than 12 months after the date of the enactment of this paragraph,

645      the Secretary, after notice and an opportunity for public comment, shall issue regulations

646      setting forth procedures for ordering commercial motor vehicle owners and operators

647      delinquent in paying civil penalties to cease operations until payment has been made.

United States of America vs Michael D. Millard May 19, 2025

648 • (9) Any aggrieved person who, after a hearing, is adversely affected by a final order issued
649     under this section may, within 30 days, petition for review of the order in the United States
650     Court of Appeals in the circuit wherein the violation is alleged to have occurred or where the
651     violator has his principal place of business or residence, or in the United States Court of
652     Appeals for the District of Columbia Circuit. Review of the order shall be based on a
653     determination of whether the Secretary's findings and conclusions were supported by
654     substantial evidence, or were otherwise not in accordance with law. No objection that has not
655     been urged before the Secretary shall be considered by the court, unless reasonable grounds
656     existed for failure or neglect to do so. The commencement of proceedings under this
657     subsection shall not, unless ordered by the court, operate as a stay of the order of the
658     Secretary.

659 • (10) All penalties and fines collected under this section shall be deposited into the Highway
660     Trust Fund (other than the Mass Transit Account).

661 • (11) In any action brought under this section, process may be served without regard to the
662     territorial limits of the district of the State in which the action is brought.

663 • (12) In any proceeding for criminal contempt for violation of an injunction or restraining
664     order issued under this section, trial shall be by the court, or, upon demand of the accused, by
665     a jury, conducted in accordance with the provisions of rule 42(b) of the Federal Rules of
666     Criminal Procedure.

667 • (13) The provisions of this subsection shall not affect chapter 51 of this title or any regulation
668     promulgated by the Secretary under chapter 51.

669 • (14) As used in this subsection, the terms "commercial motor vehicle", "employee",
670     "employer", and "State" have the meaning such terms have under section 31132 of this title.

671 • (15) Impoundment of commercial motor vehicles.-

672 • (A) Enforcement of imminent hazard out-of-service orders.-  (NOTE: "Order" not "out-of-
673     service")

674 • (i) The Secretary, or an authorized State official carrying out motor carrier safety
675     enforcement activities under section 31102, may enforce an imminent hazard out-of-service
676     order issued under chapters 5, 51, 131 through 149, 311, 313, or 315 of this title, or a
677     regulation promulgated thereunder, by towing and impounding a commercial motor vehicle
678     until the order is rescinded.

679 • (ii) Enforcement shall not unreasonably interfere with the ability of a shipper, carrier, broker,
680   or other party to arrange for the alternative transportation of any cargo or passenger being
681   transported at the time the commercial motor vehicle is immobilized. In the case of a
682   commercial motor vehicle transporting passengers, the Secretary or authorized State official
683   shall provide reasonable, temporary, and secure shelter and accommodations for passengers
684   in transit.

685 • (iii) The Secretary's designee or an authorized State official carrying out motor carrier safety
686   enforcement activities under section 31102, shall immediately notify the owner of a
687   commercial motor vehicle of the impoundment and the opportunity for review of the
688   impoundment. A review shall be provided in accordance with section 554 of title 5, except
689   that the review shall occur not later than 10 days after the impoundment.

690 • (B) Issuance of regulations.-The Secretary shall promulgate regulations on the use of
691   impoundment or immobilization of commercial motor vehicles as a means of enforcing
692   additional out-of-service orders issued under chapters 5, 51, 131 through 149, 311, 313, or
693   315 of this title, or a regulation promulgated thereunder. Regulations promulgated under this
694   subparagraph shall include consideration of public safety, the protection of passengers and
695   cargo, inconvenience to passengers, and the security of the commercial motor vehicle.

696 • (C) Definition.-In this paragraph, the term "impoundment" or "impounding" means the
697   seizing and taking into custody of a commercial motor vehicle or the immobilizing of a
698   commercial motor vehicle through the attachment of a locking device or other mechanical or
699   electronic means.

700
701
702
703
704
705
706
707
708
709

710
711
712
713
714
715
716
717
718
719
720

# Exhibit 7:

# 49 USC §31301. Definitions

721
722
723
724
725
726
727
728
729
730
731
732
733
734
735
736
737
738
739
740

United States of America vs Michael D. Millard May 19, 2025

741 • **49 USC §31301. Definitions**

742 • (4) "**commercial motor vehicle**" means a motor vehicle used in commerce to transport
743   passengers or property that-

744 • (A) has a gross vehicle weight rating or gross vehicle weight of at least 26,001 pounds,
745   whichever is greater, or a lesser gross vehicle weight rating or gross vehicle weight the
746   Secretary of Transportation prescribes by regulation, but not less than a gross vehicle weight
747   rating of 10,001 pounds;

748 • (B) is designed to transport at least 16 passengers including the driver; or

749 • (C) is used to transport material found by the Secretary to be hazardous under section 5103 of
750   this title, except that a vehicle shall not be included as a commercial motor vehicle under this
751   subclause if-

752 • (i) the vehicle does not satisfy the weight requirements of subclause (A) of this clause;

753 • (ii) the vehicle is transporting material listed as hazardous under section 306(a) of the
754   Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42
755   U.S.C. 9656(a)) and is not otherwise regulated by the Secretary or is transporting a consumer
756   commodity or limited quantity of hazardous material as defined in section 171.8 of title 49,
757   Code of Federal Regulations; and

758 • (iii) the Secretary does not deny the application of this exception to the vehicle (individually
759   or as part of a class of motor vehicles) in the interest of safety.

760 • (6) "**driver's license**" means a license issued by a State to an individual authorizing the
761   individual to operate a motor vehicle on highways.

762

763

764

765

766

767

768

United States of America vs Michael D. Millard May 19, 2025

769

770

771

772

773

# Exhibit 8:

# 49 USC §31102. Motor carrier safety assistance program

777

778

779

780

781

782

783

784

785

United States of America vs Michael D. Millard May 19, 2025

786 • **49 USC §31102. Motor carrier safety assistance program**

787 • (a) In General.-The Secretary of Transportation shall administer a motor carrier safety
788   assistance program funded under section 31104.

789 • (b) Goal.-The goal of the program is to ensure that the Secretary, States, local governments,
790   other political jurisdictions, federally recognized Indian tribes, and other persons work in
791   partnership to establish programs to improve motor carrier, commercial motor vehicle, and
792   driver safety to support a safe and efficient surface transportation system by-

793 • (1) making targeted investments to promote safe commercial motor vehicle transportation,
794   including the transportation of passengers and hazardous materials;

795 • (2) investing in activities likely to generate maximum reductions in the number and severity
796   of commercial motor vehicle crashes and in fatalities resulting from such crashes;

797 • (3) adopting and enforcing effective motor carrier, commercial motor vehicle, and driver
798   safety regulations and practices consistent with Federal requirements; and

799 • (4) assessing and improving statewide performance by setting program goals and meeting
800   performance standards, measures, and benchmarks.

801 • (c) State Plans.-

802 • (1) In general.-In carrying out the program, the Secretary shall prescribe procedures for a
803   State to submit a multiple-year plan, and annual updates thereto, under which the State agrees
804   to assume responsibility for improving motor carrier safety by adopting and enforcing State
805   regulations, standards, and orders that are compatible with the regulations, standards, and
806   orders of the Federal Government on commercial motor vehicle safety and hazardous
807   materials transportation safety.

808 • (2) Contents.-The Secretary shall approve a State plan if the Secretary determines that the
809   plan is adequate to comply with the requirements of this section, and the plan-

810 • (A) implements performance-based activities, including deployment and maintenance of
811   technology to enhance the efficiency and effectiveness of commercial motor vehicle safety
812   programs;

813 • (B) designates a *lead State commercial motor vehicle safety agency* responsible for
814   administering the plan throughout the State;

815  • (C) contains satisfactory assurances that the lead State commercial motor vehicle safety
816     agency has or will have the legal authority, resources, and qualified personnel necessary to
817     enforce the regulations, standards, and orders;

818  • (D) contains satisfactory assurances that the State will devote adequate resources to the
819     administration of the plan and enforcement of the regulations, standards, and orders;

820  • (E) provides a right of entry (or other method a State may use that the Secretary determines is
821     adequate to obtain necessary information) and inspection to carry out the plan;

822  • (F) provides that all reports required under this section be available to the Secretary on
823     request;

824  • (G) provides that the lead State commercial motor vehicle safety agency will adopt the
825     reporting requirements and use the forms for recordkeeping, inspections, and investigations
826     that the Secretary prescribes;

827  • (H) requires all registrants of commercial motor vehicles to demonstrate knowledge of
828     applicable safety regulations, standards, and orders of the Federal Government and the State;

829  • (I) provides that the State will grant maximum reciprocity for inspections conducted under
830     the North American Inspection Standards through the use of a nationally accepted system
831     that allows ready identification of previously inspected commercial motor vehicles;

832  • (J) ensures that activities described in subsection (h), if financed through grants to the State
833     made under this section, will not diminish the effectiveness of the development and
834     implementation of the programs to improve motor carrier, commercial motor vehicle, and
835     driver safety as described in subsection (b);

836  • (K) ensures that the **lead State commercial motor vehicle safety agency** will coordinate the
837     plan, data collection, and information systems with the State highway safety improvement
838     program required under section 148(c) of title 23;

839  • (L) ensures participation in appropriate Federal Motor Carrier Safety Administration
840     information technology and data systems and other information systems by all appropriate
841     jurisdictions receiving motor carrier safety assistance program funding;

842  • (M) ensures that information is exchanged among the States in a timely manner;

843  • (N) provides satisfactory assurances that the State will undertake efforts that will emphasize
844     and improve enforcement of State and local traffic safety laws and regulations related to
845     commercial motor vehicle safety;

United States of America vs Michael D. Millard May 19, 2025

846 • *(O) provides satisfactory assurances that the State will address national priorities and*
847 *performance goals, including-*

848 • (i) activities aimed at removing impaired commercial motor vehicle drivers from the
849 highways of the United States through adequate enforcement of regulations on the use of
850 alcohol and controlled substances and by ensuring ready roadside access to alcohol detection
851 and measuring equipment;

852 • (ii) activities aimed at providing an appropriate level of training to State motor carrier safety
853 assistance program officers and employees on recognizing drivers impaired by alcohol or
854 controlled substances; and

855 • (iii) *when conducted with an appropriate commercial motor vehicle inspection*, criminal
856 interdiction activities, and appropriate strategies for carrying out those interdiction activities,
857 including interdiction activities that affect the transportation of controlled substances (as
858 defined in section 102 of the Comprehensive Drug Abuse Prevention and Control Act of
859 1970 (21 U.S.C. 802) and listed in part 1308 of title 21, Code of Federal Regulations, as
860 updated and republished from time to time) by any occupant of a commercial motor vehicle;

861 • (P) provides that the State has established and dedicated sufficient resources to a program to
862 ensure that-

863 • (i) the State collects and reports to the Secretary accurate, complete, and timely motor carrier
864 safety data; and

865 • (ii) the State participates in a national motor carrier safety data correction system prescribed
866 by the Secretary;

867 • (Q) ensures that the State will cooperate in the enforcement of financial responsibility
868 requirements under sections 13906, 31138, and 31139 and regulations issued under those
869 sections;

870 • (R) ensures consistent, effective, and reasonable sanctions;

871 • (S) ensures that roadside inspections will be conducted at locations that are adequate to
872 protect the safety of drivers and enforcement personnel;

873 • (T) provides that the State will include in the training manuals for the licensing examination
874 to drive noncommercial motor vehicles and commercial motor vehicles information on best
875 practices for driving safely in the vicinity of noncommercial and commercial motor vehicles;

876    •    (U) provides that the State will enforce the registration requirements of sections 13902 and
877      31134 by prohibiting the operation of any vehicle discovered to be operated by a motor
878      carrier without a registration issued under those sections or to be operated beyond the scope
879      of the motor carrier's registration;

880    •    (V) provides that the State will conduct comprehensive and highly visible traffic enforcement
881      and commercial motor vehicle safety inspection programs in high-risk locations and
882      corridors;

883    •    (W) except in the case of an imminent hazard or obvious safety hazard, ensures that an
884      inspection of a vehicle transporting passengers for a motor carrier of passengers is conducted
885      at a bus station, terminal, border crossing, maintenance facility, destination, or other location
886      where a motor carrier may make a planned stop (excluding a weigh station);

887    •    (X) ensures that the State will transmit to its roadside inspectors notice of each Federal
888      exemption granted under section 31315(b) of this title and sections 390.23 and 390.25 of title
889      49, Code of Federal Regulations, and provided to the State by the Secretary, including the
890      name of the person that received the exemption and any terms and conditions that apply to
891      the exemption;

892    •    (Y) except as provided in subsection (d), provides that the State-

893    •    (i) will conduct safety audits of interstate and, at the State's discretion, intrastate new entrant
894      motor carriers under section 31144(g); and

895    •    (ii) if the State authorizes a third party to conduct safety audits under section 31144(g) on its
896      behalf, the State verifies the quality of the work conducted and remains solely responsible for
897      the management and oversight of the activities;

898    •    (Z) provides that the State agrees to fully participate in the performance and registration
899      information systems management under section 31106(b) not later than October 1, 2020, by
900      complying with the conditions for participation under paragraph (3) of that section, or
901      demonstrates to the Secretary an alternative approach for identifying and immobilizing a
902      motor carrier with serious safety deficiencies in a manner that provides an equivalent level of
903      safety;

904    •    (AA) in the case of a State that shares a land border with another country, provides that the
905      State-

906 • (i) will conduct a border commercial motor vehicle safety program focusing on international
907   commerce that includes enforcement and related projects; or
908 • (ii) will forfeit all funds calculated by the Secretary based on border-related activities if the
909   State declines to conduct the program described in clause (i) in its plan; and
910 • (BB) in the case of a State that meets the other requirements of this section and agrees to
911   comply with the requirements established in subsection (l)(3), provides that the State may
912   fund operation and maintenance costs associated with innovative technology deployment
913   under subsection (l)(3) with motor carrier safety assistance program funds authorized under
914   section 31104(a)(1).
915 • (3) Publication.-
916 • (A) In general.-Subject to subparagraph (B), the Secretary shall publish each approved State
917   multiple-year plan, and each annual update thereto, on a publically accessible Internet Web
918   site of the Department of Transportation not later than 30 days after the date the Secretary
919   approves the plan or update.
920 • (B) Limitation.-Before publishing an approved State multiple-year plan or annual update
921   under subparagraph (A), the Secretary shall redact any information identified by the State
922   that, if disclosed-
923 • (i) would reasonably be expected to interfere with enforcement proceedings; or
924 • (ii) would reveal enforcement techniques or procedures that would reasonably be expected to
925   risk circumvention of the law.
926 • (d) Exclusion of U.S. Territories.-The requirement that a State conduct safety audits of new
927   entrant motor carriers under subsection (c)(2)(Y) does not apply to a territory of the United
928   States unless required by the Secretary.
929 • (e) Intrastate Compatibility.-The Secretary shall prescribe regulations specifying tolerance
930   guidelines and standards for ensuring compatibility of intrastate commercial motor vehicle
931   safety laws, including regulations, with Federal motor carrier safety regulations to be
932   enforced under subsections (b) and (c). To the extent practicable, the guidelines and
933   standards shall allow for maximum flexibility while ensuring a degree of uniformity that will
934   not diminish motor vehicle safety.
935 • (f) Maintenance of Effort.-

United States of America vs Michael D. Millard May 19, 2025

936    • (1) Baseline.-Except as provided under paragraphs (2) and (3) and in accordance with section
937      5107 of the FAST Act, a State plan under subsection (c) shall provide that the total
938      expenditure of amounts of the lead State commercial motor vehicle safety agency responsible
939      for administering the plan will be maintained at a level each fiscal year that is at least equal
940      to-
941    • (A) the average level of that expenditure for fiscal years 2004 and 2005; or
942    • (B) the level of that expenditure for the year in which the Secretary implements a new
943      allocation formula under section 5106 of the FAST Act.
944    • (2) Adjusted baseline after fiscal year 2017.-At the request of a State, the Secretary may
945      evaluate additional documentation related to the maintenance of effort and may make
946      reasonable adjustments to the maintenance of effort baseline after the year in which the
947      Secretary implements a new allocation formula under section 5106 of the FAST Act, and this
948      adjusted baseline will replace the maintenance of effort requirement under paragraph (1).
949    • (3) Waivers.-At the request of a State, the Secretary may waive or modify the requirements
950      of this subsection for a total of 1 fiscal year if the Secretary determines that the waiver or
951      modification is reasonable, based on circumstances described by the State, to ensure the
952      continuation of commercial motor vehicle enforcement activities in the State.
953    • (4) Level of state expenditures.-In estimating the average level of a State's expenditures
954      under paragraph (1), the Secretary-
955    • (A) may allow the State to exclude State expenditures for federally sponsored demonstration
956      and pilot programs and strike forces;
957    • (B) may allow the State to exclude expenditures for activities related to border enforcement
958      and new entrant safety audits; and
959    • (C) shall require the State to exclude State matching amounts used to receive Federal
960      financing under section 31104.
961    • (g) Use of Unified Carrier Registration Fees Agreement.-Amounts generated under section
962      14504a and received by a State and used for motor carrier safety purposes may be included
963      as part of the State's match required under section 31104 or maintenance of effort required by
964      subsection (f).

United States of America vs Michael D. Millard May 19, 2025

965 • (h) Use of Grants To Enforce Other Laws.-When approved as part of a State's plan under
966   subsection (c), the State may use motor carrier safety assistance program funds received
967   under this section-
968 • (1) if the activities are carried out in conjunction with an appropriate inspection of a
969   commercial motor vehicle to enforce Federal or State commercial motor vehicle safety
970   regulations, for-
971 • (A) enforcement of commercial motor vehicle size and weight limitations at locations,
972   excluding fixed-weight facilities, such as near steep grades or mountainous terrains, where
973   the weight of a commercial motor vehicle can significantly affect the safe operation of the
974   vehicle, or at ports where intermodal shipping containers enter and leave the United States;
975   and
976 • (B) detection of and enforcement actions taken as a result of criminal activity, including the
977   trafficking of human beings, in a commercial motor vehicle or by any occupant, including the
978   operator, of the commercial motor vehicle; and
979 • (2) for documented enforcement of State traffic laws and regulations designed to promote the
980   safe operation of commercial motor vehicles, including documented enforcement of such
981   laws and regulations relating to noncommercial motor vehicles when necessary to promote
982   the safe operation of commercial motor vehicles, if-
983 • (A) the number of motor carrier safety activities, including roadside safety inspections,
984   conducted in the State is maintained at a level at least equal to the average level of such
985   activities conducted in the State in fiscal years 2014 and 2015; and
986 • (B) the State does not use more than 10 percent of the basic amount the State receives under
987   a grant awarded under section 31104(a)(1) for enforcement activities relating to
988   noncommercial motor vehicles necessary to promote the safe operation of commercial motor
989   vehicles unless the Secretary determines that a higher percentage will result in significant
990   increases in commercial motor vehicle safety.
991 • (i) Evaluation of Plans and Award of Grants.-
992 • (1) Awards.-The Secretary shall establish criteria for the application, evaluation, and
993   approval of State plans under this section. Subject to subsection (j), the Secretary may
994   allocate the amounts made available under section 31104(a)(1) among the States.

United States of America vs Michael D. Millard May 19, 2025

995   •   (2) Opportunity to cure.-If the Secretary disapproves a plan under this section, the Secretary
996       shall give the State a written explanation of the reasons for disapproval and allow the State to
997       modify and resubmit the plan for approval.

998   •   (j) Allocation of Funds.-

999   •   (1) In general.-The Secretary, by regulation, shall prescribe allocation criteria for funds made
1000      available under section 31104(a)(1).

1001   •   (2) Annual allocations.-On October 1 of each fiscal year, or as soon as practicable thereafter,
1002      and after making a deduction under section 31104(c), the Secretary shall allocate amounts
1003      made available under section 31104(a)(1) to carry out this section for the fiscal year among
1004      the States with plans approved under this section in accordance with the criteria prescribed
1005      under paragraph (1).

1006   •   (3) Elective adjustments.-Subject to the availability of funding and notwithstanding
1007      fluctuations in the data elements used by the Secretary to calculate the annual allocation
1008      amounts, after the creation of a new allocation formula under section 5106 of the FAST Act,
1009      the Secretary may not make elective adjustments to the allocation formula that decrease a
1010      State's Federal funding levels by more than 3 percent in a fiscal year. The 3 percent limit
1011      shall not apply to the withholding provisions of subsection (k).

1012   •   (k) Plan Monitoring.-

1013   •   (1) In general.-On the basis of reports submitted by the lead State agency responsible for
1014      administering a State plan approved under this section and an investigation by the Secretary,
1015      the Secretary shall periodically evaluate State implementation of and compliance with the
1016      State plan.

1017   •   (2) Withholding of funds.-

1018   •   (A) Disapproval.-If, after notice and an opportunity to be heard, the Secretary finds that a
1019      State plan previously approved under this section is not being followed or has become
1020      inadequate to ensure enforcement of State regulations, standards, or orders described in
1021      subsection (c)(1), or the State is otherwise not in compliance with the requirements of this
1022      section, the Secretary may withdraw approval of the State plan and notify the State. Upon the
1023      receipt of such notice, the State plan shall no longer be in effect and the Secretary shall
1024      withhold all funding to the State under this section.

1025 • (B) Noncompliance withholding.-In lieu of withdrawing approval of a State plan under
1026   subparagraph (A), the Secretary may, after providing notice to the State and an opportunity to
1027   be heard, withhold funding from the State to which the State would otherwise be entitled
1028   under this section for the period of the State's noncompliance. In exercising this option, the
1029   Secretary may withhold-

1030 • (i) up to 5 percent of funds during the fiscal year that the Secretary notifies the State of its
1031   noncompliance;

1032 • (ii) up to 10 percent of funds for the first full fiscal year of noncompliance;

1033 • (iii) up to 25 percent of funds for the second full fiscal year of noncompliance; and

1034 • (iv) not more than 50 percent of funds for the third and any subsequent full fiscal year of
1035   noncompliance.

1036 • (3) Judicial review.-A State adversely affected by a determination under paragraph (2) may
1037   seek judicial review under chapter 7 of title 5. Notwithstanding the disapproval of a State
1038   plan under paragraph (2)(A) or the withholding of funds under paragraph (2)(B), the State
1039   may retain jurisdiction in an administrative or a judicial proceeding that commenced before
1040   the notice of disapproval or withholding if the issues involved are not related directly to the
1041   reasons for the disapproval or withholding.

1042 • (l) High Priority Program.-

1043 • (1) In general.-The Secretary shall administer a high priority program funded under section
1044   31104(a)(2) for the purposes described in paragraphs (2) through (5).

1045 • (2) Activities related to motor carrier safety.-The Secretary may make discretionary grants to
1046   and enter into cooperative agreements with States, local governments, federally recognized
1047   Indian tribes, other political jurisdictions as necessary, and any person to carry out high
1048   priority activities and projects that augment motor carrier safety activities and projects
1049   planned in accordance with subsections (b) and (c), including activities and projects that-

1050 • (A) increase public awareness and education on commercial motor vehicle safety;

1051 • (B) target unsafe driving of commercial motor vehicles and noncommercial motor vehicles in
1052   areas identified as high risk crash corridors;

1053 • (C) improve the safe and secure movement of hazardous materials;

1054 • (D) improve safe transportation of goods and persons in foreign commerce;

1055 • (E) demonstrate new technologies to improve commercial motor vehicle safety;

1056 • (F) support participation in performance and registration information systems management
1057     under section 31106(b)-
1058 • (i) for entities not responsible for submitting the plan under subsection (c); or
1059 • (ii) for entities responsible for submitting the plan under subsection (c)-
1060 • (I) before October 1, 2020, to achieve compliance with the requirements of participation; and
1061 • (II) beginning on October 1, 2020, or once compliance is achieved, whichever is sooner, for
1062     special initiatives or projects that exceed routine operations required for participation;
1063 • (G) conduct safety data improvement projects-
1064 • (i) that complete or exceed the requirements under subsection (c)(2)(P) for entities not
1065     responsible for submitting the plan under subsection (c); or
1066 • (ii) that exceed the requirements under subsection (c)(2)(P) for entities responsible for
1067     submitting the plan under subsection (c);
1068 • (H) support, through the use of funds otherwise available for such purposes-
1069 • (i) the recognition, prevention, and reporting of human trafficking, including the trafficking
1070     of human beings-
1071 • (I) in a commercial motor vehicle; or
1072 • (II) by any occupant, including the operator, of a commercial motor vehicle;
1073 • (ii) the detection of criminal activity or any other violation of law relating to human
1074     trafficking; and
1075 • (iii) enforcement of laws relating to human trafficking;
1076 • (I) otherwise support the recognition, prevention, and reporting of human trafficking; and
1077 • (J) otherwise improve commercial motor vehicle safety and compliance with commercial
1078     motor vehicle safety regulations.
1079 • (3) Innovative technology deployment grant program.-
1080 • (A) In general.-The Secretary shall establish an innovative technology deployment grant
1081     program to make discretionary grants to eligible States for the innovative technology
1082     deployment of commercial motor vehicle information systems and networks.
1083 • (B) Purposes.-The purposes of the program shall be-
1084 • (i) to advance the technological capability and promote the deployment of intelligent
1085     transportation system applications for commercial motor vehicle operations, including

United States of America vs Michael D. Millard May 19, 2025

1086    commercial motor vehicle, commercial driver, and carrier-specific information systems and
1087    networks; and
1088    • (ii) to support and maintain commercial motor vehicle information systems and networks-
1089    • (I) to link Federal motor carrier safety information systems with State commercial motor
1090    vehicle systems;
1091    • (II) to improve the safety and productivity of commercial motor vehicles and drivers; and
1092    • (III) to reduce costs associated with commercial motor vehicle operations and Federal and
1093    State commercial motor vehicle regulatory requirements.
1094    • (C) Eligibility.-To be eligible for a grant under this paragraph, a State shall-
1095    • (i) have a commercial motor vehicle information systems and networks program plan
1096    approved by the Secretary that describes the various systems and networks at the State level
1097    that need to be refined, revised, upgraded, or built to accomplish deployment of commercial
1098    motor vehicle information systems and networks capabilities;
1099    • (ii) certify to the Secretary that its commercial motor vehicle information systems and
1100    networks deployment activities, including hardware procurement, software and system
1101    development, and infrastructure modifications-
1102    • (I) are consistent with the national intelligent transportation systems and commercial motor
1103    vehicle information systems and networks architectures and available standards; and
1104    • (II) promote interoperability and efficiency to the extent practicable; and
1105    • (iii) agree to execute interoperability tests developed by the Federal Motor Carrier Safety
1106    Administration to verify that its systems conform with the national intelligent transportation
1107    systems architecture, applicable standards, and protocols for commercial motor vehicle
1108    information systems and networks.
1109    • (D) Use of funds.-Grant funds received under this paragraph may be used-
1110    • (i) for deployment activities and activities to develop new and innovative advanced
1111    technology solutions that support commercial motor vehicle information systems and
1112    networks;
1113    • (ii) for planning activities, including the development or updating of program or top level
1114    design plans in order to become eligible or maintain eligibility under subparagraph (C);
1115    • (iii) for the operation and maintenance costs associated with innovative technology;

United States of America vs Michael D. Millard May 19, 2025

1116 • (iv) for the detection of, and enforcement actions taken as a result of, criminal activity
1117     (including the trafficking of human beings)-
1118 • (I) in a commercial motor vehicle; or
1119 • (II) by any occupant, including the operator, of a commercial motor vehicle; and
1120 • (v) in addition to any funds otherwise made available for the recognition, prevention, and
1121     reporting of human trafficking, to support the recognition, prevention, and reporting of
1122     human trafficking.
1123 • (E) Secretary authorization.-The Secretary is authorized to award a State funding for the
1124     operation and maintenance costs associated with innovative technology deployment with
1125     funds made available under sections 31104(a)(1) and 31104(a)(2).
1126 • *(4) Immobilization grant program.-*
1127 • (A) Definition of passenger-carrying commercial motor vehicle.-In this paragraph, the term
1128     "passenger-carrying commercial motor vehicle" has the meaning given the term
1129     *"commercial motor vehicle" in section 31301.*
1130 • *(B) Establishment.-The Secretary shall establish an immobilization grant program under*
1131     *which the Secretary shall provide to States discretionary grants for the immobilization or*
1132     *impoundment of passenger-carrying commercial motor vehicles that-*
1133 • *(i) are determined to be unsafe; or*
1134 • *(ii) fail inspection.*
1135 • (C) List of criteria for immobilization.-The Secretary, in consultation with State commercial
1136     motor vehicle entities, shall develop a list of commercial motor vehicle safety violations and
1137     defects that the Secretary determines warrant the immediate immobilization of a passenger-
1138     carrying commercial motor vehicle.
1139 • (D) Eligibility.-A State shall be eligible to receive a grant under this paragraph only if the
1140     State has the authority to require the immobilization or impoundment of a passenger-carrying
1141     commercial motor vehicle-
1142 • (i) with respect to which a motor vehicle safety violation included in the list developed under
1143     subparagraph (C) is determined to exist; or
1144 • (ii) that is determined to have a defect included in that list.
1145 • (E) Use of funds.-A grant provided under this paragraph may be used for-

United States of America vs Michael D. Millard May 19, 2025

1146 • (i) the immobilization or impound of passenger-carrying commercial motor vehicles
1147   described in subparagraph (D);
1148 • (ii) safety inspections of those passenger-carrying commercial motor vehicles; and
1149 • (iii) any other activity relating to an activity described in clause (i) or (ii), as determined by
1150   the Secretary.
1151 • (F) Secretary authorization.-The Secretary may provide to a State amounts for the costs
1152   associated with carrying out an immobilization program using funds made available under
1153   section 31104(a)(2).
1154 • (5) Commercial motor vehicle enforcement training and support grant program.-
1155 • (A) In general.-The Secretary shall administer a commercial motor vehicle enforcement
1156   training and support grant program funded under section 31104(a)(3), under which the
1157   Secretary shall make discretionary grants to eligible entities described in subparagraph (C)
1158   for the purposes described in subparagraph (B).
1159 • (B) Purposes.-The purposes of the grant program under subparagraph (A) are-
1160 • (i) to train non-Federal employees who conduct commercial motor vehicle enforcement
1161   activities; and
1162 • (ii) to develop related training materials.
1163 • (C) Eligible entities.-An entity eligible for a discretionary grant under the program described
1164   in subparagraph (A) is a nonprofit organization that has-
1165 • (i) expertise in conducting a training program for non-Federal employees; and
1166 • (ii) the ability to reach and involve in a training program a target population of commercial
1167   motor vehicle safety enforcement employees.
1168
1169
1170
1171
1172
1173
1174
1175
1176

United States of America vs Michael D. Millard May 19, 2025

1177
1178
1179
1180

1181

1182

1183

# Exhibit 9:

# 49 USC §31132. Definitions

1186
1187
1188
1189
1190
1191
1192
1193
1194
1195
1196
1197
1198
1199
1200
1201
1202

United States of America vs Michael D. Millard May 19, 2025

1203 • **49 USC §31132. Definitions**

1204 • **In this subchapter-**

1205 • (1) "**commercial motor vehicle**" means a self-propelled or towed vehicle used on the

1206 • highways in **interstate commerce** to transport passengers or property, if the vehicle-

1207 • (A) has a gross vehicle weight rating or gross vehicle weight of at least *10,001 pounds*,

1208 • whichever is greater;

1209 • (B) is designed or used to transport more than 8 passengers (including the driver) for

1210 • compensation;

1211 • (C) is designed or used to transport more than 15 passengers, including the driver, and is not

1212 • used to transport passengers for compensation; or

1213 • (D) is used in transporting material found by the Secretary of Transportation to be hazardous

1214 • under section 5103 of this title and transported in a quantity requiring placarding under

1215 • regulations prescribed by the Secretary under section 5103.

1216 • (2) "employee" means an operator of a commercial motor vehicle (including an independent

1217 • contractor when operating a commercial motor vehicle), a mechanic, a freight handler, or an

1218 • individual not an employer, who-

1219 • (A) directly affects commercial motor vehicle safety in the course of employment; and

1220 • (B) is not an employee of the United States Government, a State, or a political subdivision of

1221 • a State acting in the course of the employment by the Government, a State, or a political

1222 • subdivision of a State.

1223 • (3) "employer"-

1224 • (A) means a person engaged in a business affecting interstate commerce that owns or leases a

1225 • commercial motor vehicle in connection with that business, or assigns an employee to

1226 • operate it; but

1227 • (B) does not include the Government, a State, or a political subdivision of a State.

1228 • (4) "interstate commerce" means trade, traffic, or transportation in the United States between

1229 • a place in a State and-

1230 • (A) a place outside that State (including a place outside the United States); or

1231 • (B) another place in the same State through another State or through a place outside the

1232 • United States.

United States of America vs Michael D. Millard May 19, 2025

1233  • (5) "intrastate commerce" means trade, traffic, or transportation in a State that is not
1234    interstate commerce.
1235  • (6) "medical examiner" means an individual licensed, certified, or registered in accordance
1236    with regulations issued by the Federal Motor Carrier Safety Administration as a medical
1237    examiner.
1238  • (7) "regulation" includes a standard or order.
1239  • (8) "State" means a State of the United States, the District of Columbia, and, in sections
1240    31136 and 31140–31142 [1] of this title, a political subdivision of a State.
1241  • (9) "State law" includes a law enacted by a political subdivision of a State.
1242  • (10) "State regulation" includes a regulation prescribed by a political subdivision of a State.
1243  • (11) "United States" means the States of the United States and the District of Columbia.
1244
1245
1246
1247
1248
1249
1250
1251
1252
1253
1254
1255
1256
1257
1258
1259

United States of America vs Michael D. Millard May 19, 2025

1260

1261

1262

1263

1264

1265

# Exhibit 10:

## 49 USC §31136. United States Government regulations

1266

1267

1268

1269

1270
1271
1272
1273
1274
1275
1276
1277
1278
1279
1280
1281
1282

1283 • **49 USC §31136. United States Government regulations**
1284 • (a) Minimum Safety Standards.-Subject to section 30103(a) of this title, the Secretary of
1285   Transportation shall prescribe regulations on commercial motor vehicle safety. The
1286   regulations shall prescribe minimum safety standards for commercial motor vehicles. At a
1287   minimum, the regulations shall ensure that-
1288 • (1) commercial motor vehicles are maintained, equipped, loaded, and operated safely;
1289 • (2) the responsibilities imposed on operators of commercial motor vehicles do not impair
1290   their ability to operate the vehicles safely;
1291 • (3) the physical condition of operators of commercial motor vehicles is adequate to enable
1292   them to operate the vehicles safely and the periodic physical examinations required of such
1293   operators are performed by medical examiners who have received training in physical and
1294   medical examination standards and, after the national registry maintained by the Department
1295   of Transportation under section 31149(d) is established, are listed on such registry;
1296 • (4) the operation of commercial motor vehicles does not have a deleterious effect on the
1297   physical condition of the operators; and
1298 • (5) an operator of a commercial motor vehicle is not coerced by a motor carrier, shipper,
1299   receiver, or transportation intermediary to operate a commercial motor vehicle in violation of
1300   a regulation promulgated under this section, or chapter 51 or chapter 313 of this title.
1301 • (b) Eliminating and Amending Existing Regulations.-The Secretary may not eliminate or
1302   amend an existing motor carrier safety regulation related only to the maintenance, equipment,
1303   loading, or operation (including routing) of vehicles carrying material found to be hazardous
1304   under section 5103 of this title until an equivalent or more stringent regulation has been
1305   prescribed under section 5103.
1306 • *(c) Procedures and Considerations.-(1) A regulation under this section shall be prescribed*
1307   *under section 553 of title 5 (without regard to sections 556 and 557 of title 5).*
1308 • (2) Before prescribing regulations under this section, the Secretary shall consider, to the
1309   extent practicable and consistent with the purposes of this chapter-
1310 • (A) costs and benefits; and
1311 • (B) State laws and regulations on commercial motor vehicle safety, to minimize their
1312   unnecessary preemption.
1313 • (d) Effect of Existing Regulations.-If the Secretary does not prescribe regulations on
1314   commercial motor vehicle safety under this section, regulations on commercial motor vehicle
1315   safety prescribed by the Secretary before October 30, 1984, and in effect on October 30,
1316   1984, shall be deemed in this subchapter to be regulations prescribed by the Secretary under
1317   this section.
1318 • (e) Exemptions.-The Secretary may grant in accordance with section 31315 waivers and
1319   exemptions from, or conduct pilot programs with respect to, any regulations prescribed under
1320   this section.
1321 • (f) Regulatory Impact Analysis.-
1322 • (1) In general.-Within each regulatory impact analysis of a proposed or final major rule
1323   issued by the Federal Motor Carrier Safety Administration, the Secretary shall, whenever
1324   practicable-
1325 • (A) consider the effects of the proposed or final rule on different segments of the motor
1326   carrier industry; and
1327 • (B) formulate estimates and findings based on the best available science.

United States of America vs Michael D. Millard May 19, 2025

1328    • (2) Scope.-To the extent feasible and appropriate, and consistent with law, an analysis
1329      described in paragraph (1) shall-
1330    • (A) use data that is representative of commercial motor vehicle operators or motor carriers,
1331      or both, that will be impacted by the proposed or final rule; and
1332    • (B) consider the effects on commercial truck and bus carriers of various sizes and types.
1333    • (g) Public Participation.-
1334    • (1) In general.-If a proposed rule under this part is likely to lead to the promulgation of a
1335      major rule, the Secretary, before publishing such proposed rule, shall-
1336    • (A) issue an advance notice of proposed rulemaking; or
1337    • (B) proceed with a negotiated rulemaking.
1338    • (2) Requirements.-Each advance notice of proposed rulemaking issued under paragraph (1)
1339      shall-
1340    • (A) identify the need for a potential regulatory action;
1341    • (B) identify and request public comment on the best available science or technical
1342      information relevant to analyzing potential regulatory alternatives;
1343    • (C) request public comment on the available data and costs with respect to regulatory
1344      alternatives reasonably likely to be considered as part of the rulemaking; and
1345    • (D) request public comment on available alternatives to regulation.
1346    • (3) Waiver.-This subsection does not apply to a proposed rule if the Secretary, for good
1347      cause, finds (and incorporates the finding and a brief statement of reasons for such finding in
1348      the proposed or final rule) that an advance notice of proposed rulemaking is impracticable,
1349      unnecessary, or contrary to the public interest.
1350
1351

1352

1353

1354

1355

1356

1357

1358

1359

1360

1361

1362

1363

1364

1365

United States of America vs Michael D. Millard May 19, 2025

1366

1367

1368

1369

1370

1371

1372

1373

1374

1375

1376

1377

1378

1379

1380

# Exhibit 11:

# President Trump's Executive Order 14286

# "Enforcing Commonsense Rules of

# the Road for America's Truck Drivers."

LEGAL STATUS

This site displays a prototype of a "Web 2.0" version of the daily Federal Register. It is not an official legal edition of the Federal Register, and does not replace the official print version or the official electronic version on GPO's govinfo.gov.

The documents posted on this site are XML renditions of published Federal Register documents. Each document posted on the site includes a link to the corresponding official PDF file on govinfo.gov. This prototype edition of the daily Federal Register on FederalRegister.gov will remain an unofficial informational resource until the Administrative Committee of the Federal Register (ACFR) issues a regulation granting it official legal status. For complete information about, and access to, our official publications and services, go to About the Federal Register on NARA's archives.gov.

The OFR/GPO partnership is committed to presenting accurate and reliable regulatory information on FederalRegister.gov with the objective of establishing the XML-based Federal Register as an ACFR-sanctioned publication in the future. While every effort has been made to ensure that the material on FederalRegister.gov is accurately displayed, consistent with the official SGML-based PDF version on govinfo.gov, those relying on it for legal research should verify their results against an official edition of the Federal Register. Until the ACFR grants it official status, the XML rendition of the daily Federal Register on FederalRegister.gov does not provide legal notice to the public or judicial notice to the courts.

LEGAL STATUS

# Enforcing Commonsense Rules of the Road for America's Truck Drivers

A Presidential Document by the Executive Office of the President on 05/02/2025

**PUBLISHED CONTENT - DOCUMENT DETAILS**

**Agency:** Executive Office of the President
**Document Citation:** 90 FR 18759
**Document Number:** 2025-07786
**Document Type:** Presidential Document
**Presidential Document Type:** Executive Order
**EO Citation:** EO 14286
**Pages:** 18759-18760 (2 pages)
**Publication Date:** 05/02/2025

**READER AIDS - EXECUTIVE ORDER DETAILS**

Executive order notes are compiled and maintained by the Office of the Federal Register editors.

**EO Citation:** EO 14286
**EO Notes:** See: EO 14224, March 1, 2025

**President:** Donald J. Trump

1381
1382

Signing Date: April 28, 2025

PUBLISHED DOCUMENT: 2025-07786 (90 FR 18759)

Executive Order 14286 (/executive-order/14286) of April 28, 2025

## Enforcing Commonsense Rules of the Road for America's Truck Drivers

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* America's truck drivers are essential to the strength of our economy, the security of our Nation, and the livelihoods of the American people. Every day, truckers perform the demanding and dangerous work of transporting the Nation's goods to businesses, customers, and communities safely, reliably, and efficiently.

Proficiency in English, which I designated as our official national language in Executive Order 14224 (/executive-order/14224) of March 1, 2025 (Designating English as the Official Language of the United States), should be a non-negotiable safety requirement for professional drivers. They should be able to read and understand traffic signs, communicate with traffic safety, border patrol, agricultural checkpoints, and cargo weight-limit station officers. Drivers need to provide feedback to their employers and customers and receive related directions in English. This is common sense.

That is why Federal law requires that, to operate a commercial vehicle, a driver must "read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records." Yet this requirement has not been enforced in years, and America's roadways have become less safe.

My Administration will enforce the law to protect the safety of American truckers, drivers, passengers, and others, including by upholding the safety enforcement regulations that ensure that anyone behind the wheel of a commercial vehicle is properly qualified and proficient in our national language, English.

1383
1384

Sec. 2 . *Policy.* It is the policy of my Administration to support America's truckers and safeguard our roadways by enforcing the commonsense English-language requirement for commercial motor vehicle drivers and removing needless regulatory burdens that undermine the working conditions of America's truck drivers. This order will help ensure a safe, secure, and efficient motor carrier industry.

Sec. 3 . *Upholding English Proficiency Requirements for Commercial Motor Vehicle Operators.* (a) The Secretary of Transportation, acting through the Administrator of the Federal Motor Carrier Safety Administration (FMCSA), shall, within 60 days of the date of this order, rescind the guidance document titled, "English Language Proficiency Testing and Enforcement Policy MC-ECE-2016-006," issued on June 15, 2016, and issue new guidance to FMCSA and enforcement personnel outlining revised inspection procedures necessary to ensure compliance with the requirements of 49 CFR 391.11(b)(2) (https://www.ecfr.gov/current/title-49/section-391.11#p-391.11(b)(2)).

(b) In carrying out subsection (a) of this section, the Secretary of Transportation, through the Administrator of the FMCSA, shall take all necessary and appropriate actions, consistent with applicable law, to ensure that the out-of-service criteria are revised such that a violation of the English language proficiency requirement results in the driver being placed out-of-service, including by working with the relevant entities responsible for establishing the out-of-service criteria. ( printed page 18760)

Sec. 4 . *Strengthening Commercial Driver's License Security for Safer Commercial Motor Vehicle Operations.* The Secretary of Transportation, through the Administrator of the FMCSA, shall:

(a) review non-domiciled commercial driver's licenses (CDLs) issued by relevant State agencies to identify any unusual patterns or numbers or other irregularities with respect to non-domiciled CDL issuance; and

(b) evaluate and take appropriate actions to improve the effectiveness of current protocols for verifying the authenticity and validity of both domestic and international commercial driving credentials.

1385
1386

**Sec. 5** . *Supporting America's Truck Drivers.* Within 60 days of the date of this order, the Secretary of Transportation shall identify and begin carrying out additional administrative, regulatory, or enforcement actions to improve the working conditions of America's truck drivers.

**Sec. 6** . *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The Department of Transportation shall provide funding for this order's publication in the *Federal Register*.

(https://img.federalregister.gov/TRUMP/TRUMP_original_size.png)

THE WHITE HOUSE, April 28, 2025. Filed 5-1-25; 8:45 am]
[FR Doc. 2025-07786 (/d/2025-07786)

Billing code 4910-9X-P

PUBLISHED DOCUMENT: 2025-07786 (90 FR 18759)

1387

1388

1389

1390

1391

1392

United States of America vs Michael D. Millard May 19, 2025

1393
1394
1395
1396
1397
1398
1399
1400
1401
1402
1403

# Exhibit 12:

1404

# English Language Proficiency Testing and

1405

# Enforcement Policy MC-ECE-

1406

# 2016-006" issued June 14, 2016.

1407

1408

United States of America vs Michael D. Millard May 19, 2025



**Memorandum**

U.S. Department
of Transportation

Federal Motor Carrier
Safety Administration

Subject: **ACTION**: English Language Proficiency
Testing and Enforcement Policy
MC-ECE-2016-006

Date: JUN 1 5 2016

From: William A. Quade,
Associate Administrator for Enforcement

Reply to
Attn. of:

To: All FMCSA Staff

## PURPOSE:

This policy memorandum provides guidance to Federal Motor Carrier Safety Administration (FMCSA) personnel conducting safety investigations, audits, and inspections of commercial motor vehicles (CMV) and drivers using the Commercial Vehicle Safety Alliance's (CVSA) North American Inspection Standards. This policy removes the requirement to place drivers out of service for English Language Proficiency (ELP) violations and changes the Agency's standard for determining non-compliance with the ELP requirements at 49 CFR § 391.11(b)(2) based on direction from the Office of the Secretary (OST) and the U.S. Department of Justice (DOJ).

## CANCELLATION:

This policy memorandum supersedes the policy memoranda issued on this subject titled, "Placing Drivers Out of Service for Violating 49 CFR 391.11(b)(2) English Language Proficiency" dated July 20, 2007, and "49 CFR Section 391.11(b)(2) English Language Proficiency" dated February 1, 2008.

## BACKGROUND:

Section 391.11(b)(2) of the Federal Motor Carrier Safety Regulations requires drivers operating CMVs in interstate commerce to "read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on required reports and records."

Additionally on April 26, 1995 the North American Free Trade Agreement, Land Transportation Standards Subcommittee on Commercial Motor Vehicle and Driver Standards and Motor Carrier Compliance agreed to a resolution on language proficiency of CMV vehicle drivers as follows: "That in recognition of the three countries' language differences it is the responsibility of the driver and the motor carrier to be able to communicate in the country in which the driver /carrier is operating so that safety is not compromised."

CVSA amended its out-of-service (OOS) criteria, effective April 1, 2005, to include violations of 49 CFR Section 391.11(b)(2). In a July 20, 2007 policy memorandum, the Office of Enforcement issued guidance instructing inspectors to cite drivers and/or motor carriers for violations of 49 CFR 391.11(b)(2) when a driver fails to communicate in English sufficiently to understand and respond to official inquiries and directions, and to place the driver out-of-service. The same memorandum provided guidance and an assessment tool to confirm a driver's ability to communicate English sufficiently to understand and respond to official inquiries and directions.

In a second ELP policy memorandum, effective February 1 2008 FMCSA staff and enforcement personnel were provided a tool specifically for evaluating a drivers ability to understand U.S. highway traffic signs. The 2008

1409
1410

policy allowed the driver to explain his/her understanding of the highway traffic signs in a language other than English, provided the inspector is able to understand the explanation.

Additionally, on October 1, 2014, FMCSA published regulatory guidance titled, "Driver Qualifications; Regulatory Guidance Concerning the Applicability of Language Requirement to Drivers Who Do Not Meet the Hearing Standard" [79 FR 59139]. This guidance explained that the English language rule should not be construed to prohibit operation of a commercial motor vehicle (CMV) by hearing impaired drivers who can read and write in the English language but do not speak for whatever reason, and were granted exemptions by FMCSA. Specifically, the guidance advises that a driver who is granted an exemption from 49 CFR 391.41(b)(11) would not be considered unqualified under the English language proficiency requirement in 49 CFR 391.11(b)(2) if the driver is capable of reading and writing in the English language. In that circumstance, the hearing impaired driver satisfies the English language requirement.

More recently, CVSA members voted to remove 49 CFR 391.11(b)(2) from their out of service criteria because they could not substantiate the safety impact s. This change went into effect on April 1, 2015. As a result FMCSA is formally canceling its policy of citing non-compliance with this regulation as an OOS violation, effective immediately.

In addition, FMCSA Grant Applicants are required to sign the FMCSA Title VI Program Assurance, which includes as authorities Title VI of the Civil Rights Act of 1964 (Title VI) and Executive Order #13166 (Limited English Proficiency or LEP). As a result, FMCSA Recipient- conducted enforcement activities (to include inspection activities) are to be implemented in a non-discriminatory manner that comports with the National Origin protection under Title VI generally and affording reasonable accommodation to LEP drivers specifically.

### POLICY:
Formal driver interviews to confirm ELP will not be conducted during roadside inspections.

If the driver can communicate sufficiently to complete the inspection or investigation, he/she should not be cited for violations of 391.11(b)(2). If the driver cannot read, write, or speak English but can communicate sufficiently with the inspector/investigator, he/she should not be cited for a violation of 391.11(b)(2).

Tools to facilitate communication such as interpreters, I-Speak cards, cue cards, smart phone applications, and On-Call Telephone Interpretation Service may be used when interacting with drivers. Federal Highway Administration Recipients (primarily State Departments of Transportation) are required to have developed Language Access Plans under their Title VI Programs and may be useful resources to contact regarding available LEP tools and resources. Use of these devices does not constitute a violation of 391.11(b)(2).

If a deaf or hard-of-hearing driver has obtained an exemption from the hearing standard under 49 CFR 391.41(b)(11), the deaf or hard-of-hearing driver satisfies the English language requirement, if they can read and write English sufficiently to communicate.

If a non-English speaking driver acknowledges that he/she does not speak English, the driver should be cited for a violation of Section 391.11(b)(2). However, this is no longer an OOS violation.

This policy does not apply to inspections in Puerto Rico, Guam, the Northern Mariana Islands or American Samoa, as each of these territories has an official language in addition to English.

If a driver is cited for a violation of the ELP requirements and the employing motor carrier provides information advising that the employee has completed English language training, it should be considered sufficient documentation for addressing this violation.

If during an investigation, there is a pattern of violations discovered and the motor carrier is also identified for prioritization by the Safety Measurement System through an Alert in the Driver Fitness BASIC, enforcement action on these violations may be considered.

1411
1412

**EFFECTIVE DATE:**

This policy is effective immediately. Please share this information with the State Motor Carrier Safety Assistance Program lead agency.

If you have any questions or comments regarding application of this policy, please contact Bill Mahorney, Chief, Enforcement Division, at 202-493-0001 or Bill.Mahorney@dot.gov.

1413

1414

1415

1416

1417

1418

United States of America vs Michael D. Millard May 19, 2025

1419
1420
1421
1422
1423
1424
1425
1426
1427
1428
1429
1430
1431

# Exhibit 13:

# May 12, 2003; Federal Register; Volume 68; Number 142; 49 CFR Part 391 [Docket Number FMCSA 1997-2759]; RIN 2126-AA31 (Formerly RIN 2125-AE19); English Language Requirements Qualification of Drivers withdrawal

1432
1433
1434
1435
1436
1437

Federal Register / Vol. 68, No. 142 / Thursday, July 24, 2003 / Proposed Rules    43889

Issued on: May 12, 2003.
Mary E. Peters,
*Federal Highway Administrator.*
[FR Doc. 03–16594 Filed 7–23–03; 8:45 am]
BILLING CODE 4910–22–P

---

## DEPARTMENT OF TRANSPORTATION

### Federal Motor Carrier Safety Administration

**49 CFR Part 391**

[Docket No. FMCSA 1997–2750]

RIN 2126–AA31 (Formerly RIN 2125–AE19)

### English Language Requirement; Qualifications of Drivers; Withdrawal

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), DOT.

**ACTION:** Advance notice of proposed rulemaking (ANPRM); withdrawal.

**SUMMARY:** The FMCSA withdraws its advance notice of proposed rulemaking (ANPRM) requesting comments on potential changes to a provision in the Federal Motor Carrier Safety Regulations (FMCSRs) involving the English language. That provision requires that drivers of commercial motor vehicles (CMVs) operating in interstate commerce be able to "read and speak the English language sufficiently to converse with the general public, understand highway traffic signs and signals, respond to official inquiries, and make entries on reports and records." After analysis and review of the comments, FMCSA has concluded that at this time there is no quantifiable data on which to propose modifying the regulation to require a more stringent or definitive standard, or to require State motor vehicle agencies to administer a specific test for English proficiency.

**DATES:** The advance notice of proposed rulemaking published on August 26, 1997, at 62 FR 45200 is withdrawn as of July 24, 2003.

**FOR FURTHER INFORMATION CONTACT:** Mary Moehring, Driver and Carrier Operations Division, (202) 366–4001, Federal Motor Carrier Safety Administration, Department of Transportation, 400 Seventh Street, SW., Washington, DC 20590.

**SUPPLEMENTARY INFORMATION:**

### Background

On August 26, 1997, the Federal Highway Administration (FHWA), predecessor agency to the FMCSA, published an ANPRM in the **Federal Register** (at 62 FR 45200) requesting comments on potential changes to 49

CFR 391.11(b)(2) of the FMCSRs. This provision requires that drivers of CMVs operating in interstate commerce be able to "read and speak the English language sufficiently to converse with the general public, understand highway traffic signs and signals, respond to official inquiries, and make entries on reports and records."

The ANPRM was published in response to a letter from the American Civil Liberties Union (ACLU) to the U.S. Department of Transportation's Office of Civil Rights indicating that this English language requirement may conflict with Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, et seq. as amended, that prohibits discrimination against applicants and beneficiaries in the administration of federally funded programs and activities based on race, color and national origin. In this letter, the ACLU also alleged that the regulation, as written, is overly broad and subject to arbitrary enforcement, causing potential interference with the constitutional guarantees of due process and equal protection.

In the ANPRM, the FHWA stated that § 391.11(b)(2), as promulgated by the former Interstate Commerce Commission (ICC) in 1936, was intended to be enforced through the motor carrier employer. As noted in the ANPRM, the ICC specifically stated that it was the motor carrier employer's responsibility to evaluate the driver's proficiency in the English language. In addition, FHWA noted that the regulation was not intended to be enforced at the roadside. The employer was presumed to know what communication skills may be necessary for the type of cargo handled, the route taken, and the public contact required. The FHWA went on to say that it had never made speaking the English language a specific pre-requisite for obtaining a Commercial Driver License (CDL), and in fact proposed, and later authorized, administration of the CDL test in foreign languages.

The ANPRM asked the following 5 questions:

"1. Are there known instances in which a safety problem occurred which could be attributed, in whole or in part, to the driver not being able to read and speak English sufficiently to understand traffic signs or written or verbal instruction relating to the operation, loading or unloading of the vehicle? * * *

2. Do any of the States require drivers who operate commercial motor vehicles exclusively in intrastate commerce to read and speak the English language? * * *

3. How do States typically determine whether or not a driver or motor carrier is in violation of § 391.11(b)(2) or an equivalent

State provision? Are there particular English phrases or terms that are used to test the driver's comprehension of the English language? Are there specific highway signs or messages that are shown to the driver?

4. Are there any cases in which State officials, exercising their authority under State law, have placed drivers out of service for being unable to read or speak the English language, after making a determination that the driver's inability to comprehend the language created a safety risk that was too great to be ignored? * * *

5. How does one measure an individual's level of 'English proficiency' or whether that individual has a 'working knowledge of English?' * * *"

### Comments

Fifty-eight comments were received. These came from 9 States, the U.S. Equal Employment Opportunity Commission (EEOC), the ACLU, individual citizens, associations representing various segments of the trucking industry, insurance associations, several trucking companies, individual drivers and trucking industry management, associations representing State and Provincial motor and motor vehicle administrators, associations and unions representing drivers, and safety advocates.

Very few of the comments addressed the questions asked in the ANPRM. The vast majority of those commenting viewed the ANPRM as a proposal to lower the current English proficiency standard. The comments from groups representing the trucking industry, labor groups representing drivers, insurance companies and associations, and individual companies and drivers all recommended retaining the current provision. Nine States submitted comments that either recommended retaining the current standard or promulgating a more stringent standard. Of the members of the public who commented, 20 commenters recommended that the FMCSA either retain the current English language standard or enact a more stringent standard.

Mr. Victor Morales submitted a copy of a motion filed by counsel on his behalf in the County Court for Palm Beach County, Florida requesting the Court to declare § 316.302, Florida Statutes (1997), relating to the English proficiency requirement for CMV drivers, unconstitutional on the basis that it was vague, overly broad, and subject to arbitrary enforcement. Two commenters believed that the agency should revise the regulation to require a performance-based standard. Representative Lincoln Diaz-Balart (who represented Congressional District 21 in

1438

United States of America vs Michael D. Millard May 19, 2025

43890    Federal Register / Vol. 68, No. 142 / Thursday, July 24, 2003 / Proposed Rules

Floridal opposes FMCSA's current regulation at § 391.11(b)(2) "due to a recurring problem in our state as it pertains to enforcement of this regulation." Representative Diaz-Balart states that his constituents have had their CDLs suspended due to enforcement of § 391.11(b)(2). Examples include, * * * "traffic citations to CDL drivers for not commanding the English language to the satisfaction of the law enforcement officer, thereby giving him or her unfettered discretion; suspension of the licenses by judges, magistrates and/or officers of the peace of those drivers for not being able to communicate in English with the judge when appearing in Court; violation of due process and therefore the posing of many civil rights questions." Representative Diaz-Balart urged the agency to revise § 391.11(b)(2) to protect the constitutional and civil rights of drivers, and to end the arbitrary application of the regulation. Another member of Congress stated that the current regulation ought to be retained for safety reasons. The Advocates for Highway and Auto Safety stated its belief that a "performance-based" standard might result in unacceptably low levels of English proficiency that would directly endanger the traveling public.

The ACLU submitted comments explaining why, in its view, the current regulation has a discriminatory impact upon national and ethnic minorities, and invited discriminatory enforcement. The EEOC stated it shared the concern of the ACLU that as "currently written, the FMCSRs' English fluency requirement may conflict with the Federal civil rights laws." The EEOC suggested drafting a qualification standard in broad terms that could be applied in a manner appropriate to a specific job for a specific employer.

**Decision**

The FMCSA has decided to withdraw the ANPRM. After analysis and review of the comments, FMCSA has concluded that at this time there is no quantifiable data on which to propose modifying the regulation either to require a more stringent or definitive standard or to require State motor vehicle agencies to administer a specific test for English proficiency.

The FMCSA appreciates the analysis provided by the EEOC and the ACLU relating to the requirements of Title VI. However, the information introduced in response to the ANPRM does not establish that the current regulation requires an unnecessarily high level of English fluency that has resulted in a discriminatory impact or effect based

upon national origin, color or ethnicity. Accordingly, FMCSA believes that the regulation as currently written and properly enforced effectively balances issues of civil rights and highway safety.

In analyzing § 391.11(b)(2) in today's climate, the FMCSA believes that the regulation was, and remains, a requirement imposed to ensure that persons who drive commercial motor vehicles operate safely. As written, the regulation sets forth the qualifications of drivers of CMVs to read and speak the English language and allows each motor carrier employer the flexibility to determine the extent of proficiency needed to enforce it. It provides carriers with the flexibility to individually determine whether a driver has communication skills and English fluency to operate safely on the highway. There is no data available to suggest that this flexibility has caused discrimination or to conclude that motor carriers are employing the English language requirement in anything other than an evenhanded manner, tailored to the requirements of each particular company's operations. Nor do we have evidence to suggest that our State and local partners are subjecting limited English speakers to discrimination based on their race, color or national origin. The intent of the English-only regulation is not to discriminate, but to advance public safety and this is an essential aspect of our program.

Specifically, with regard to concerns about arbitrary or discriminatory enforcement, the FMCSA has found no evidence to suggest that enforcement officers routinely issue citations for lack of English proficiency. To the extent that such enforcement discretion is exercised, the FMCSA believes that such instances are exceedingly rare and may be occasioned by a misunderstanding of the provisions of § 391.11(b)(2). From the comments and the data available, the FMCSA believes that the discretion of enforcement officials to place a driver out of service when he or she constitutes a safety hazard is, and has been used judiciously.

Further, FMCSA finds no inconsistency in its authorization to States to offer CDL tests in languages other than English, while at the same time requiring motor carrier employers to ensure a level of English proficiency for drivers on our public highways. The tests, training and study manuals associated with obtaining a CDL are complex. Therefore, the administration of the CDL test in languages other than English is justified. However, in actual operation on the highway, the CDL

driver must be able, based on the needs of the carrier's operation, to have a sufficient command of English to ensure that safety is not compromised.

After reviewing the comments, the FMCSA is also persuaded that the performance-oriented standard, based on required tasks, as suggested in the ANPRM and advocated by the ACLU and EEOC is, in fact, not substantively different than the current standard to which persons who drive commercial motor vehicles must already adhere. The FMCSA is mindful of the concerns voiced by safety groups and members of the enforcement community that drivers with limited English proficiency may pose a potential safety concern both on the roadway, as well as in situations in which an enforcement officer is conducting a vehicle inspection, weighing a vehicle, or in other routine law enforcement actions. At this time, however, as noted, the FMCSA has no quantifiable data on which to base a proposal that would modify the standards in or scope of the existing regulation at 49 CFR 391.11(b)(2).

One other matter requires comment here. Under Executive Order 13166, titled "Improving Access to Services for Persons with Limited English Proficiency" (65 FR 50121, September 16, 2000), and guidance issued on the same day by the Department of Justice (DOJ), titled "Enforcement of Title VI of the Civil Rights Act of 1964—National Origin Discrimination Against Persons With Limited English Proficiency" (65 FR 50123), the Federal government must ensure that no person with limited English Proficiency (LEP) shall be discriminated against on the grounds of race, color or national origin under any program or activity that receives Federal financial assistance.

Consistent with the executive order, the DOJ guidance, and additional guidance issued by the Department of Transportation titled, "DOT Guidance to Recipients on Special Language Services to Limited English Proficient (LEP) Beneficiaries" (66 FR 6733), we believe that the regulation at 49 CFR 391.11(b)(2) is fully consistent with FMCSA's commitment to provide meaningful access to programs and activities that persons with limited English proficiency would seek. We are confident that the rule fulfills its purpose of advancing safety in a manner wholly in keeping with the terms of the executive order and the corresponding guidance.

In view of the foregoing considerations, Docket No. FMCSA–1997–2759 is withdrawn.

1439

Federal Register / Vol. 68, No. 142 / Thursday, July 24, 2003 / Proposed Rules    43891

Issued on: July 11, 2003.

Annette M. Sandberg,

*Acting Administrator.*

[FR Doc. 03–18597 Filed 7–23–03; 8:45 am]

BILLING CODE 4910–EX–P

## DEPARTMENT OF TRANSPORTATION

**Federal Motor Carrier Safety Administration**

**49 CFR Part 393**

[Docket No. FMCSA–1997–2213 (Formerly FHWA Docket No. MC–93–34]

RIN 2126–AA12 (formerly RIN 2125–AD25)

**Parts and Accessories Necessary for Safe Operation: Sleeper Berths on Motorcoaches; Withdrawal**

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), DOT.

**ACTION:** Notice of withdrawal of proposed rulemaking.

**SUMMARY:** The FMCSA withdraws its January 12, 1994 Advance Notice of Proposed Rulemaking (ANPRM) relating to the use and design of driver sleeper berths used by the motorcoach industry. Due to other regulatory priorities and minimal interest by the industry concerning this issue, no further action was taken by the FMCSA after publication of the ANPRM. At this time FMCSA chooses not to establish potentially design-restrictive regulatory standards for the use of sleeper berths on motorcoaches without authoritative research to guide their development. Accordingly, the January 12, 1994 ANPRM regarding the use and design of motorcoach sleeper berths is withdrawn.

**DATES:** The advance notice of proposed rulemaking published on January 12, 1994, at 59 FR 1706 is withdrawn as of July 24, 2003.

**FOR FURTHER INFORMATION CONTACT:** John Steinhoff, Chief, Commercial Passenger Carrier Safety Division, (202) 366–2174, Office of Bus and Truck Standards and Operations, Federal Motor Carrier Safety Administration, Department of Transportation, 400 Seventh Street, NW., Washington, DC 20590.

**SUPPLEMENTARY INFORMATION:** On January 12, 1994, the Federal Highway Administration (FHWA) (now FMCSA), issued an ANPRM requesting public comment on the use and design of driver sleeper berths used by the motorcoach industry (59 FR 1706). This action was taken in response to comments received in past years from the motorcoach industry, and ones offered specifically at a motorcoach

industry Zero-Base Review (an initiative in which the agency presumed that no prior regulations existed, and started drafting from a clean slate, or as if we had "zero" regulations). The hearing was held in Miami, Florida, on January 20, 1993. There was some concern among the industry that when the current sleeper berth regulations at 49 CFR 393.76 were promulgated, the differences in design and operation between motorcoaches and trucks may not have been considered by the agency.

The FHWA received nine comments to the docket in response to the ANPRM. The comments varied as to whether the regulations should be amended and whether the agency should prohibit the placement of a sleeper berth in the baggage area (under the passenger compartment) of a motorcoach. The current regulation prohibits placement of the sleeper berth in the cargo compartment. Some commenters believed that specific sleeper berth standards for motorcoaches would improve safety by improving the physical well-being of the driver and by providing an opportunity for a relief driver to get adequate rest.

Due to other regulatory priorities and a minimal interest by the industry concerning this issue, no further action was taken by the FMCSA after these comments were received.

Operationally, the motorcoach industry rarely uses sleeper berths, choosing to transport replacement drivers to rely points for the few non-stop trips that are longer than 500 miles in length. The vast majority of motorcoach trips are broken into segments where less than 10 hours of driving are required. Therefore, FMCSA believes there is no urgent safety need for the agency to initiate regulatory action on this matter.

The FMCSA believes there is presently no research on which to base the development of new, motorcoach-oriented sleeper berth specifications. The current requirement in § 393.76 sets forth the minimum specifications for sleeper berths, and these are far exceeded by the present-day truck manufacturers. While § 393.76 is geared more toward sleeper berth installations in the truck environment, the basic principles set forth for trucks could also be adhered to by motorcoach manufacturers. These principles include: a prohibition from placing the sleeper berth in the cargo compartment (in this case, the baggage compartment), a requirement for an exit from the sleeper berth into the driver's compartment (in this case, the passenger compartment, which also includes the driver's location), and provision for

occupant restraint meeting the spirit of paragraph (h) of § 393.76. When conducting roadside inspections and compliance reviews, FMCSA considers these principles in applying the language of § 393.76 to sleeper berths installed in motorcoaches.

At this time, the FMCSA chooses not to develop regulatory standards for the use of sleeper berths on motorcoaches without authoritative research to guide their development. This could result in design-restrictive requirements. Rather, the agency intends to work with the motorcoach manufacturers, the motorcoach industry, and safety organizations, such as the Commercial Vehicle Safety Alliance, to explore the development of a voluntary industry standard for motorcoach sleeper berth manufacture and maintenance. The FMCSA intends to work with these organizations to determine how the principles of § 393.76 apply to current and future motorcoach design and operations.

For these reasons, the January 12, 1994 ANPRM is withdrawn.

Issued on: July 11, 2003.

Annette M. Sandberg,

*Acting Administrator.*

[FR Doc. 03–18600 Filed 7–23–03; 8:45 am]

BILLING CODE 4910–EX–M

## DEPARTMENT OF TRANSPORTATION

**Federal Motor Carrier Safety Administration**

**49 CFR Part 393**

[Docket No. FMCSA–1997–2278 (Formerly Docket No. MC–96–5]

RIN 2126–AA19 (formerly RIN 2125–AD76)

**Parts and Accessories Necessary for Safe Operation: Television Receivers and Data Display Units; Withdrawal**

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), DOT.

**ACTION:** Notice of withdrawal of proposed rulemaking.

**SUMMARY:** The FMCSA withdraws its April 3, 1996, Notice of Proposed Rulemaking (NPRM) to rescind restrictions on the locations at which television receivers may be positioned within commercial motor vehicles (CMVs). After reviewing the public comments received in response to the NPRM, the agency no longer considers the restrictions to be obsolete and redundant. The agency believes that it is necessary to retain the rule to prohibit unsafe driver behavior, and that doing so is not likely to discourage the use of

1440

1441

1442

United States of America vs Michael D. Millard May 19, 2025

1443

1444

1445

1446

1447

1448

1449

1450

# Exhibit 14:

1451

# March 16, 2015, article from Transport

1452

# Topics CVSA Removes English

1453

# Requirement in Updated Out-of-Service

1454

# Guidelines

1455

United States of America vs Michael D. Millard May 19, 2025

**Government**    March 16, 2015 1:45 AM, EDT

# CVSA Removes English Requirement In Updated Out-of-Service Guidelines

*By Eric Miller, Staff Reporter*
**This story appears in the March 16 print edition of Transport Topics.**

Roadside inspectors no longer will place Mexican or Canadian commercial vehicle drivers operating in the United States out of service if they are unable to communicate in English, according to new Commercial Vehicle Safety Alliance "tolerance guidelines."



*Keppler, photo by CVSA*

CVSA said the procedures will go into effect April 1.

1456

1457

1458

Other policy changes in CVSA's 2015 out-of-service handbook include allowing inspectors to take drivers off the road not only for fatigue but also if they are "likely to become impaired" by fatigue.

Last year's fatigue guidance simply stated that drivers be placed out of service when they were so fatigued that they "should not continue the trip."

The changes were approved by CVSA's board and the majority of the membership, said Stephen Keppler, the group's executive director. The manual was sent to members earlier this month.

Other additions allow inspectors to take trucks off the road for deficiencies detected in hydraulic and electric brakes, ranging from loose or missing brake caliper mounting bolts to improperly joined lines and hoses.

The manual also instructs inspectors to place trucks out of service for cracks in the mounting angle iron of fifth-wheel coupling devices.

Keppler said the language requirement was removed this year because lacking command of a language does not create an "imminent hazard" or place a driver in "imminent danger of a crash."

While most of the manual's changes were not difficult for a majority of the CVSA members to approve, the language change "was hotly debated," he said.

Some inspectors expressed concerns that a driver unable to understand commands during a roadside inspection could place an officer in danger, he said.

"When you're under the vehicle checking brakes and other things, if they can't understand you, they could put the officer in a significant safety-risk scenario," Keppler said. "But the out-of-service criteria are highway-safety standards, not officer-safety standards," he added.

For that reason, the organization decided to remove language proficiency as a requirement.

Federal regulations state that, for a commercial vehicle driver to be qualified, he or she must be able to "read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries and to make entries on reports and records."

1459

1460

1461

Federal Motor Carrier Safety Administration spokesman Duane DeBruyne said there is no conflict between the CVSA out-of-service criteria and federal safety regulations related to English proficiency of drivers.

"While it remains a violation, one that should be recorded — as all violations at the roadside should be recorded — we agree that particular one does not constitute an imminent hazard," DeBruyne said.

"We've been work-studying the issue for over two years," Keppler said. "There's been some additional research that's been done on this, looking at trying to substantiate the link between language proficiency and crash data, but the link has not been established."

Keppler said inspectors have difficulty interpreting the language-proficiency regulation. Because of that challenge, CVSA filed a petition with FMCSA in October seeking clarity on the issue.

Keppler also said CVSA's fatigue out-of-service guidance has been "subjective" and can be difficult for inspectors to enforce.

"So we modified the language in the out-of-service criteria to mirror the actual [FMCSA] regulation," he said. "If it's a regulatory violation, it's an out-of-service condition."

CVSA has petitioned the agency for a clarification of the fatigue regulation, Keppler said.

To illustrate the subjective nature of the fatigue regulation, in 2013, inspectors placed 1,276 drivers out of service for fatigue, he said. That same year, there were 3.5 million roadside driver inspections.

"If you take FMCSA's hours-of-service rulemaking, they use a cost-benefit analysis that projected 13% of drivers were driving fatigued at any point in time," Keppler said.

"Thirteen percent of 3.5 million is close to 450,000 drivers. So if we had a good regulation that was clear and able to be effectively enforced, that number of out-of-service drivers should have gone from 1,200 to 450,000."

**More Content About:** *CVSA*

1462

1463

1464

United States of America vs Michael D. Millard May 19, 2025

1465

1466

1467

1468

1469

1470

1471

1472

# Exhibit 15:

1473

## SMS CSA snapshot identifying OOS

1474

## violations and impact on carrier's score

1475

United States of America vs Michael D. Millard May 19, 2025

 **SMS** Safety Measurement System

### Learn About the CSA Prioritization Preview

FMCSA is proposing a new prioritization methodology to keep enforcement efforts focused on the carriers in most need of intervention. Learn more about these changes and how they will improve highway safety.

Visit the CSA Prioritization Preview



**SWIFT TRANSPORTATION CO OF ARIZONA LLC**
U.S. DOT#: 54283
Address: 2200 S 75TH AVE
PHOENIX, AZ 85043
Number of Vehicles: 13,875
Number of Drivers: 13,500
Number of Inspections: 22,641

**Safety Rating & OOS Rates**
(As of 05/02/2025 updated daily from **SAFER**.)

**SATISFACTORY**
(Rating Date: 06/19/2006)

**Out of Service Rates**

| Type | OOS % | National Avg % |
|---|---|---|
| Vehicle | 19.7 | 23.1 |
| Driver | 1.2 | 6.1 |
| Hazmat | 0.6 | 3.0 |

**Licensing and Insurance**
(As of 05/02/2025 updated hourly from L&I )

Active For-Hire Authority

| Type | Yes/No | MC#/MX# |
|---|---|---|
| Property | Yes | MC-136818 |
| Passenger | No | |
| Household Goods | No | |
| Broker | Yes | MC-136818 |

### BASIC Status (Public Property Carrier View) ?
Behavior Analysis & Safety Improvement Categories (BASICs)

View CSA Prioritization Preview
Based on a 24-month record ending March 28, 2025

     

| | | Not Public | | | Not Public | |
| Unsafe Driving | Crash Indicator | Hours-of-Service Compliance | Vehicle Maintenance | Controlled Substances and Alcohol | Hazardous Materials Compliance | Driver Fitness |

Select a BASIC icon above to get details, or view your Complete SMS Profile.

## BASIC: Driver Fitness

### On-Road Performance

Measure: 0.05 ?

Safety Event Group: 501+ relevant driver inspections

1476

1477

1478

1479

United States of America vs Michael D. Millard May 19, 2025

| Report | | | Vehicle | | | Measure = Sum of the Total Weight (TotW) Sum of the Time Weight (TiW) | | |
|---|---|---|---|---|---|---|---|---|
| Inspection Date | Number | State | Plate Number | Plate State | Type | Severity Weight (SW) | Time Weight (TiW) | Total Weight (TotW) |
| 3/22/2025 | CANF4W000201 | CA | 3161368 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/22/2025 | CAUEHJ005402 | CA | 3409194 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/22/2025 | CAUCRG000399 | CA | 2970016 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/22/2025 | TXV251799420 | TX | 3698746 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | ORAP43030413 | OR | 3106099 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | AR7940000580 | AR | 3608186 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | CO1467440029 | CO | 3698162 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | TNI01RA81484 | TN | 3697809 | IN | Truck Tractor | 4 | 3 | 12 |
| Violation: 391.41B10-MC Medical (Certificate) - Operating a commercial vehicle without corrective lenses or hearing aid as indicated on the driver's medical certificate. (OOS) | | | | | | 2 + 2 (OOS) | | |
| 3/21/2025 | TNI034P40063 | TN | 3227248 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | TNI031N80080 | TN | 3518001 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | TNI032450023 | TN | 3162448 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | TNI5Z3041957 | TN | 3607093 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | TNI032450020 | TN | 3227450 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | MO6348000619 | MO | 3226974 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | WVPSC1420619 | WV | 3698343 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | KYCV44831583 | KY | 3409645 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | KYCV44703318 | KY | 3607327 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | IA000P1130D9 | IA | 3698140 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | MILITTJ05425 | MI | BB69887 | MI | Straight Truck | 1 | 3 | 3 |
| Violation: 391.41A-MCPC Medical (Certificate) - Operating a property-carrying vehicle without possessing a valid medical certificate. | | | | | | 1 | | |
| 3/21/2025 | CAUCAR003208 | CA | 3519651 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | AZ7656000616 | AZ | 3106480 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | FL3227009393 | FL | 2971089 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | LALANWS03582 | LA | 3225831 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | INS417009126 | IN | 2970496 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | CAUETA000796 | CA | 3698408 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | CANEZA001864 | CA | 3518118 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | CANEZA001871 | CA | 3162178 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | TXV251811733 | TX | 3161341 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/21/2025 | TXV251816783 | TX | 3227142 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | KYCV41757457 | KY | 3698061 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | MIESCOT02573 | MI | 3226915 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | NET102000591 | NE | 3519514 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | NV7103028605 | NV | 3698867 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | CANEBC002298 | CA | 2971211 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | CANCTX007026 | CA | 3409261 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | CANEBC002295 | CA | 3408755 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | SC0396000704 | SC | 2969743 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | MO3214000491 | MO | 3161156 | MO | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | TNI035D41328 | TN | 3607772 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | MTU667600842 | MT | 3227236 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | AR5080000378 | AR | 3519300 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/20/2025 | MACY00003290 | MA | 3408594 | IN | Truck Tractor | 0 | 3 | 0 |
| | | | | | Sum of measure weights | 1,326 | 39,319 | 2,338 |

1480

1481

1482

United States of America vs Michael D. Millard May 19, 2025

| | Report | | | Vehicle | | Measure = Sum of the Total Weight (TotW) Sum of the Time Weight (TiW) | | |
|---|---|---|---|---|---|---|---|---|
| Inspection Date | Number | State | Plate Number | Plate State | Type | Severity Weight (SW) | Time Weight (TiW) | Total Weight (TotW) |
| 3/13/2025 | CANC0J006881 | CA | 3698133 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/13/2025 | OKN600000788 | OK | 3161968 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/13/2025 | CAUC5Z002295 | CA | 3408406 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/13/2025 | GA1273000571 | GA | 3107805 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/13/2025 | GA1305000315 | GA | 3698950 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/13/2025 | NYSPG4030039 | NY | 2971082 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/13/2025 | CANE28005707 | CA | 3107291 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | NC0006737258 | NC | 3409897 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CAUCBX000828 | CA | 3226238 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CANEKW003136 | CA | 3106508 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CAUCL5004730 | CA | 2971032 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | MD1983C00037 | MD | 3519210 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | MOW109004686 | MO | 2970700 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | VA8028000669 | VA | 3697950 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | ID4048001854 | ID | 3698132 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/13/2025 | KYCV41015155 | KY | 360327 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | NC0006737332 | NC | 3226209 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | NC0006737480 | NC | 3518001 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | NC0006737548 | NC | 3409324 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | NM6230P1ZFWH | NM | 3226202 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | NM9278P1ZGN4 | NM | 3162588 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | KSHP03970503 | KS | 3698502 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | MICEL4S01123 | MI | 3163051 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | TXV251813368 | TX | 3607144 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CANOLR005421 | CA | 3697994 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CAN0DN006094 | CA | 3517995 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CANC20007724 | CA | 2555128 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CANECK003030 | CA | 3697649 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CAUE66000727 | CA | | CA | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | TNI033DZ0067 | TN | 2531288 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | WA2134000508 | WA | 3226201 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | TNI038F10052 | TN | 3608092 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CO0575732278 | CO | 3518149 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | OH0428000074 | OH | 3226421 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CO1691720232 | CO | 2969999 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | CO1561500936 | CO | 3162870 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | WAX769007377 | WA | 3162845 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | TNI034W51239 | TN | 3517799 | IN | Truck Tractor | 4 | 3 | 12 |
| Violation: 391.41B1D-MC Medical (Certificate) - Operating a commercial vehicle without corrective lenses or hearing aid as indicated on the driver's medical certificate. (OOS) | | | | | | 2 + 2 (OOS) | | |
| 3/12/2025 | WA2082001897 | WA | 2970744 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | IN9702003668 | IN | 3607091 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | IN5476002468 | IN | 3698719 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | IL4005150825 | IL | 3107841 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | TXV251799742 | TX | 3408686 | IN | Truck Tractor | 0 | 3 | 0 |
| 3/12/2025 | TXV251807672 | TX | 3106600 | IN | Truck Tractor | 0 | 3 | 0 |
| | | | | | Sum of measure weights | 1,326 | 39,319 | 2,338 |

1483

1484

1485

1486

1487

1488

1489

1490

1491

1492

1493

# Exhibit 16:

1494

# CSA SMS Methodology

1495

1496



1497

1498

SMS Methodology    2. Design of the SMS BASIC Prioritization Status

management of CMV driver fatigue. *Example violations include: operating a CMV while ill or fatigued, requiring or permitting a property-carrying CMV driver to drive more than 11 hours, failing to preserve RODS for 6 months/failing to preserve supporting documents.*

- Vehicle Maintenance BASIC—Failure to properly maintain a CMV and prevent shifting loads, spilled or dropped cargo, and overloading of a CMV. *Example violations include: inoperative brakes, lights, and other mechanical defects, improper load securement, failure to make required repairs.*

- Controlled Substances/Alcohol BASIC—Operation of CMVs by drivers who are impaired due to alcohol, illegal drugs, and misuse of prescription or over-the-counter medications. *Example violations include: use or possession of controlled substances or alcohol, failing to implement an alcohol and/or controlled substance testing program.*

- HM Compliance BASIC (not publicly available)—Unsafe handling of HM on a CMV. *Example violations include: failing to mark, label, or placard in accordance with the regulations, not properly securing a package containing HM, leaking containers, failing to conduct a test or inspection on a cargo tank when required by the United States Department of Transportation (U.S. DOT).*

- Driver Fitness BASIC—Operation of CMVs by drivers who are unfit to operate a CMV due to lack of training, experience, or medical qualifications. *Example violations include: failing to have a valid and appropriate commercial driver's license (CDL), being medically unqualified to operate a CMV, failing to maintain driver qualification files.*

In addition to the seven BASICs, there is an Insurance/Other Indicator used for prioritization that incorporates violations found during investigations. The Insurance/Other Indicator is defined as follows:

- Insurance/Other Indicator (not publicly available)—Failure to comply with registration, insurance, or other reporting requirements. *Example violations include: operating a CMV without the minimum level of financial responsibility, failing to maintain copies of crash reports.*

## 2.2 Data Sources

The SMS assesses an individual carrier's performance by BASIC calculated from information collected from roadside inspections, State-reported CMV crash records, and Acute and Critical Violations from investigations. These data are recorded in the Motor Carrier Management Information System (MCMIS). In addition, motor carrier Census data, also recorded in MCMIS, are used for the identification and normalization of safety event group data. Below are more detailed descriptions of each data source.

- Roadside inspections are examinations that a certified Motor Carrier Safety Assistance Program (MCSAP) inspector (usually State or local law enforcement personnel) conducts on individual CMVs and drivers to determine if they are in compliance with the FMCSRs and/or HMRs.

  - Violations are recorded during inspections and entered into the MCMIS database. A subset of these violations may result in a driver or vehicle being placed out-of-

1499

1500

SMS Methodology        2. Design of the SMS BASIC Prioritization Status

service (OOS). The OOS violations must be corrected before the affected driver or vehicle is allowed to return to service. The SMS assessments are based on the safety violations listed in Appendix A. These assessments, however, do not include those violations that are: (1) a result of a crash[8]; (2) assigned exclusively to another entity such as a shipper or Intermodal Equipment Provider (IEP); or (3) indicated as "dismissed/not guilty" based on the adjudicated citation process.

○ *Note:* Some roadside inspections are performed following a traffic enforcement stop for a moving violation. Violations reported on the inspection form during such stops do not always result in the issuance of a citation to the driver, but are used in the SMS whether or not a citation is issued.

- <u>Investigations</u> are examinations that a certified Safety Investigator (SI) conducts on individual motor carriers to evaluate their compliance with the FMCSRs and/or HMRs. There are two types of investigations: Offsite Investigations and Onsite Investigations. Offsite Investigations address emerging safety problems and do not occur at the carrier's principal place of business (PPOB). During an Offsite Investigation, an SI works with the carrier remotely to identify safety problems using documentation that the carrier provides related to each BASIC. Onsite Investigations occur at the carrier's PPOB, and may focus on specific safety problems (Onsite Focused Investigation) or the carrier's entire operations (Onsite Comprehensive Investigation).

  ○ <u>Violations</u> are recorded during investigations and entered into the MCMIS database. Acute and Critical Violations are a subset of these violations. This subset of violations is defined in the current Safety Fitness Procedures (<u>49 CFR 385 Appendix B</u>). An Acute Violation, also known as a one-time occurrence violation, is triggered by noncompliance so severe that immediate corrective action is required. A Critical Violation, also known as a pattern of occurrence violation, is triggered by a pattern of noncompliance related to the carrier's management or operational controls that is found during an investigation. For more information on each type of violation, see section 2.4.

- <u>State-Reported Commercial Vehicle Crash Data</u> are taken from MCMIS and provide information on crashes as reported by State and local law enforcement officials. Crashes found to be not preventable by FMCSA's CPDP will be listed on the SMS Website as "Reviewed – Not Preventable," but excluded when from a carrier's measure and percentile in the Crash Indicator BASIC. A reportable crash is defined in <u>49 CFR 390.5</u> as a crash that involves a CMV operating on a public roadway, which results in a fatality, an injury, and/or a tow-away.

- <u>Motor Carrier Census Data</u> are first collected when a carrier obtains a U.S. DOT number. The

---

[8] Only pre-existing violations from post-crash inspections are used in the SMS. Violations from post-crashes inspection flagged as "Y" for Yes or "U" for Unknown as being attributed to the crash are *not* used.



U.S. Department of Transportation
Federal Motor Carrier Safety Administration

September 2024
2-3


Compliance • Safety • Accountability

1501

1502

1503

United States of America vs Michael D. Millard May 19, 2025

1504

1505

1506

1507

1508

1509

1510

1511

# Exhibit 17:

1512

## DOT CDL Demographics

1513

1514

1515

1516

1517

1518

1519

1520

1521

1522

1523

1524

United States of America vs Michael D. Millard May 19, 2025



## Demographics of the CMV Workforce

Presentation to WOTAB| August 14, 2023



1525



1526

1527                      **No data on number of CDL holders that *cannot* speak English.**

1528

1529

1530

1531

United States of America vs Michael D. Millard May 19, 2025

1532

1533

1534

1535

1536

1537

1538

1539

# Exhibit 18:

# Large truck & bus pocket guide

1540

1541

1542

1543

1544

1545

1546

1547

1548

1549

1550

1551

1552

United States of America vs Michael D. Millard May 19, 2025



1553

1554    **2024 Pocket Guide has not been released as of May 19, 2025**

United States of America vs Michael D. Millard May 19, 2025

### 1-10 FMCSA-Regulated Carriers by Domicile, 2022

| Country | Active Carriers with a USDOT Number | Power Units | CDL Drivers | Total Drivers |
|---|---|---|---|---|
| United States | 793,577 | 5,254,235 | 4,038,350 | 5,643,647 |
| Canada | 13,968 | 113,810 | 110,440 | 123,518 |
| Mexico | 5,989 | 34,276 | 23,556 | 31,982 |
| Certificate Carriers | 152 | 729 | 514 | 629 |
| Commercial Zone Carriers | 5,703 | 31,727 | 22,150 | 29,415 |
| Enterprise Carriers | 1,047 | 8,150 | 7,303 | 8,199 |
| Long Haul Carriers | 70 | 1,573 | 682 | 1,675 |
| Other Countries | 310 | 2,697 | 213 | 1,142 |
| All Domiciles | 813,844 | 5,405,018 | 4,172,559 | 5,800,289 |

Notes: U.S. domiciled carriers include carriers domiciled in the 50 U.S. States, the District of Columbia, and the U.S. territories. The sum of the Mexican carrier types may not sum to the total as some of the Mexican-owned carriers are domiciled in the United States. Only interstate carriers and intrastate hazardous materials (HM) carriers with recent activity are included in this table. FMCSA regulates all motor carriers that operate in interstate commerce, and certain requirements for motor carriers and commercial motor vehicles (CMVs) that transport HM in intrastate commerce. Beginning on November 1, 2013, FMCSA's Unified Registration System (URS) rule requires all regulated entities to update their registration information every 24 months. The Agency deactivates the USDOT number of any carrier that fails to comply with the biennial update requirement. A Mexican certificate carrier is a Mexico-domiciled motor carrier that transports exempt commodities or operates as a private motor carrier. These motor carriers were issued authority to operate trucks to points in the United States beyond the commercial zones. FMCSA stopped issuing these certificates in 2002. A Mexican commercial zone carrier is a Mexico-domiciled carrier that has authority to operate only within the U.S.-Mexico border commercial zones in the United States. A Mexican enterprise carrier is a Mexican-owned or controlled carrier that is domiciled in the United States and operates in the United States, conducting cross-border transportation of international cargo that originates in or is destined for a foreign country. A Mexican long-haul carrier is a Mexico-domiciled carrier that has authority to engage in long-haul transportation in the United States as a motor carrier of property (except household goods and placardable HM) in interstate commerce in or beyond the border the border commercial zones. The authority does not allow point-to-point transportation service within the United States for goods other than international cargo. Reports include activity for all U.S. operations from the date the carrier was first allowed to operate up through the date of the current data snapshot.
Data Source: FMCSA, Motor Carrier Management Information System (MCMIS), data snapshot as of December 31, 2022.

12   *2023 Pocket Guide to Large Truck and Bus Statistics*

1555

1556      **4.172 million CDL holders vs 5.8 million total CMV drivers 49 CFR Part §391.11(b)(2)**

1557                          **impacts the 5.8 million CMV drivers.**

## 2. INSPECTIONS AND VIOLATIONS

### What is an Inspection?

An inspection is an examination of an individual commercial motor vehicle (CMV) and/or driver by an authorized safety inspector. State inspectors conduct approximately 95 percent of inspections, with the remainder conducted by Federal inspectors. The inspection determines whether the driver and/ or the CMV is in compliance with the Federal Motor Carrier Safety Regulations (FMCSRs) or the Hazardous Materials Regulations (HMRs), as appropriate. Serious violations result in the issuance of vehicle or driver out-of-service (OOS) orders. These violations must be corrected before the affected driver or vehicle can return to service.

**2-1  Inspections Conducted by Federal and State Inspectors, 2018–2022**

|  | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Inspections | 3,515,954 | 3,471,201 | 2,582,347 | 2,881,848 | 2,984,331 |
| State | 3,390,262 | 3,361,853 | 2,556,548 | 2,835,323 | 2,898,862 |
| Federal | 125,692 | 109,348 | 25,799 | 46,525 | 85,469 |

Data Source: FMCSA, Motor Carrier Management Information System (MCMIS), data snapshot as of January 27, 2023.

**2-2  Safety Inspectors, Federal and State, 2018–2022**

| Inspector Type | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Safety Inspectors | 13,839 | 13,597 | 12,782 | 12,744 | 12,591 |
| State | 13,320 | 13,089 | 12,420 | 12,275 | 12,100 |
| Federal | 519 | 508 | 362 | 469 | 491 |

Note. Not all personnel indicated are assigned full-time to conducting inspections. Data Source: FMCSA, Motor Carrier Management Information System (MCMIS), data snapshot as of January 27, 2023.

*2023 Pocket Guide to Large Truck and Bus Statistics*    **17**

1558

1559        **12,100 state inspectors represent MCSAP officers represented by CVSA**

1560            **491 federal inspectors represent DOT employees**

1561    **The 813,844 carriers with 5.8 million drivers has the 12,591 DOT inspectors hopelessly**
1562                    **out numbered**

United States of America vs Michael D. Millard May 19, 2025

1563

1564

1565

1566

1567

1568

1569

# Exhibit 19:

## 2004 DOT Information 11 million CDL holders 3.0 to 3.3 million CDL jobs

1570

1571

1572

1573

United States of America vs Michael D. Millard May 19, 2025

 **Commercial Motor Vehicle Facts**
Federal Motor Carrier Safety Administration
February 2004 

| Truck Drivers | |
|---|---|
| 2000 "Employed Truck Drivers" | 3.0 million to 3.3 million |
| 2003 Commercial Drivers License (CDL) Records | 11 million |

Sources: Employed Truck Drivers: U.S. Department of Transportation, Bureau of Transportation Statistics (BTS), based on U.S. Department of Labor, Bureau of Labor Statistics, *2000 National Occupational Employment and Wage Estimates, Transportation and Material Moving Occupations* (occupational employment statistics); and *2000-10 National Employment Matrix* (detailed occupation by industry, employment projections). CDL Records: FMCSA, Commercial Drivers License Information System (CDLIS). Note: Denotes records in CDLIS, not active CDL drivers or CDL holders.

| Hours of Service (HOS) Related Statistics for Large Trucks | |
|---|---|
| 1997-2000 Average Fatalities in Fatigue-Related Crashes | 375 |
| 1997-2000 Average Injuries in Fatigue-Related Crashes | 7,500 |
| 2002 Total Cost of Fatigue-Related Crashes (1999 Dollars) | $2.3 billion |
| Lives That Could Have Been Saved in 2002 by 100% HOS Compliance* | 75 to 120 |
| Estimated Annual Cost Savings to Motor Carriers of 100% HOS Compliance* | $900 million to −$1.3 billion |
| Net Benefits of Rule* | $1.1 billion to −$800 million |

*Depending on baseline. Positive dollar figures are based on the assumption that all drivers were in compliance with the old HOS regulations. Negative dollar figures are based on the assumption that some drivers were not in compliance with the old HOS regulations.
Source: FMCSA Regulatory Evaluation, "Hours of Service of Drivers; Driver Rest and Sleep for Safe Operations," RIN2126-AA23.

| FY 2003 Roadside Inspections and Out-Of-Service (OOS) Rates for Commercial Vehicles | Large Trucks | Commercial Buses |
|---|---|---|
| Driver Inspections | 2,962,274 | 24,617 |
| Driver OOS Rate | 6.8% | 5.7% |
| Vehicle Inspections | 2,115,384 | 35,584 |
| Vehicle OOS Rate | 23.2% | 10.3% |

Source: FMCSA, Motor Carrier Management Information System (MCMIS)

1574

1575       **2004 was the last year the DOT published the number of CDL holders, there is a myth**

1576       **the public is told there's a shortage of drivers.   Report shows 3.0 to 3.3 million CDL**

1577       **jobs with 11 million CDL holders.  Above 2022 report shows 4.172 million CDL holders**

1578       **and 5.8 million total CMV drivers.  Freedom of Information Act request from 2023**

1579       **received June 2024 indicated there were 15 million CDL holders.  As a result of the so-**

1580       **called driver shortage, 64,000 H-2B visas for CDL holders were approved in 2024.**

1581       **Based on my research the English-speaking driver situation is caused mostly by asylum**

1582                                              **seekers.**

United States of America vs Michael D. Millard May 19, 2025

1583

1584

1585

1586

1587

1588

1589

1590 **Exhibit 20:**

1591 **Excerpts from the 2025 OOS Criteria**

1592

1593

United States of America vs Michael D. Millard May 19, 2025



1594

1595

United States of America vs Michael D. Millard May 19, 2025



1596

1597   **OOS Criteria is prepared by CVSA a 503(c) non-profit organization that falls outside**

1598   **49 USC §521(b)(5)(A) and (B), but it's stated "(1) is a matter of law;" "Imminent**

1599   **hazard" is mentioned.  49 USC §322(b) requires the DOT to delegate powers and duties**

1600   **to a DOT officer or employee.**

1601

1602

United States of America vs Michael D. Millard May 19, 2025



1603

1604        **Imminent hazard mentioned.  CVSA wasn't granted the authority to identify**

1605                                     **"imminent hazards."**

1606

1607

United States of America vs Michael D. Millard May 19, 2025



A critical vehicle inspection item violation(s) (out of service or otherwise) noted during a CVSA Level I Inspection that is successfully repaired on-site and re-inspected by the same inspector at the same inspection location will qualify for a CVSA decal as long as all previously noted critical vehicle inspection item violation(s) have been properly repaired. In such instances, only a re-inspection of the repaired violation(s) shall be done with decal(s) being applied to the vehicle(s) and properly noted upon the original inspection.

Any vehicle that is repaired off-site or inspected by a different inspector shall be required to have a complete inspection conducted in order to obtain a CVSA decal.

These criteria are neither suited nor intended to serve as vehicle maintenance or performance standards.

1608

1609

United States of America vs Michael D. Millard May 19, 2025



**"1. BRAKE SYSTEMS**

**·a. DEFECTIVE BRAKES**

The number of defective brakes is equal to or greater than 20% of the service brakes on the vehicle or combination. A defective brake includes any brake that meets one of the following conditions (396.3(a)(1))

**NOTE:** Steering axle brakes under "Front Steering Axle(s) Brakes" are to be included in the 20% criterion.

Defective Brake Chart (below) shall be used in determining when a vehicle/combination is to be declared out of service.

**DEFECTIVE BRAKE CHART**

| Total Number of Brakes Required to be on a Vehicle Combination* | Total Number of Defective Brakes Necessary to Declare the Vehicle or Combination Out of Service |
|---|---|
| 4 | 1 |
| 6 | 2 |
| 8 | 2 |
| 10 | 2 |
| 12 | 3 |
| 14 | 3 |
| 16 | 4 |
| 18 | 4 |
| 20 | 4 |
| 22 | 5 |
| ** | |

*All brakes in use, whether required or not, are included in the total number of brakes (e.g., driveaway/towaway)

** Vehicle Combination with More Than 22 Brakes – Total Number of Defective Brakes Necessary to Declare the Vehicle Combination Out of Service.

Determine the number of defective brakes required by using 20% of the total number of brakes on the vehicle or combination (e.g., 24 x 0.2 = 4.8 brakes). Round all fractions up to the next whole number (e.g., 4.8 brakes = 5 required defective brakes).

OOS Criteria limits scope of 49 CFR Part §391.1(c) and §396.3. DOT doesn't have regulations to identify "imminent hazard." 49 CFR Appendix B to Part §385 list "Acute" and "Critical" violations no mention of "imminent hazard" in Federal Motor Carrier Safety Regulations 49 CFR Parts §350 through §399.

49 CFR Appendix B to Part 385—Explanation of Safety Rating Process

§ 392.6 Scheduling a run which would necessitate the vehicle being operated at speeds in excess of those prescribed (critical).

§ 392.9(a)(1) Requiring or permitting a driver to drive without the vehicle's cargo being properly distributed and adequately secured (critical).

§ 395.1(h)(1)(i)(A) Requiring or permitting a property-carrying commercial motor vehicle driver to drive more than 15 hours (Driving in Alaska) (critical).



1622

1623        **OOS violations have a higher point value and impact a carrier's safety management**

1624        **assessment based on the roadside inspection data collected by MCSAP officers.  DOT**

1625        **should identify OOS defects per 49 USC §302, §322, §31136, and 5 USC §553.**

1626

United States of America vs Michael D. Millard May 19, 2025



(3) Audible air leak at other than a proper connection. (393.45(d))

Inspection Bulletin 2010-05 – MCI Buses with Detroit Diesel Engines

Inspection Bulletin 2015-08 – Advancement in Motorcoach Air Brake Systems

Operational Policy 15 – Part II, OOS Frequently Asked Questions 1.a.(1) – Proper Connections, 1.a.(2) – Leaks at Fittings

Operational Policy 15 – Part II, Regulatory Guidance, 1.b.(3) – Air Leaks

(4) Improperly joined, such as a splice made by sliding the hose ends over a piece of tubing and clamping the hose to the tube. (393.45(a))

*(5) Damaged by heat or broken. (393.45(d))

*(6) Labeled for a different application other than in an air brake system. (393.45(a))

*(7) All required air brakes on towed vehicle(s) inoperative due to service gladhand not connected to the trailer(s). (393.45(d))

**NOTE:** After service gladhand connection is re-established, all towed vehicle(s) required brakes shall be inspected and, if applicable, recorded as per Operational Policy 14 - Enhancing Roadside Inspection and Enforcement Data Uniformity.

**i. AIR PRESSURE GAUGE**

Inoperative or defective primary or secondary air pressure gauge. (393.51(c))

**j. LOW AIR PRESSURE WARNING DEVICE**

Low air pressure warning device missing, inoperative or does not operate continuously if either the primary or secondary reservoir is 55 psi (379 kPa) or below, or 1/2 of the governor cut-out pressure, whichever is less. (393.51(c))

**NOTE:** If either an audible or visual warning device is working as required, vehicle should not be declared out of service.

**k. AIR LOSS RATE**

If an air leak is discovered and either the primary or secondary reservoir pressure is not maintained when: (396.3(a)(1))

(1) Governor is cut-in.

(2) Reservoir pressure is 80-90 psi (551-620 kPa).

(3) Engine is at idle.

(4) Service brakes are either fully applied or released.

28    © 2025 COMMERCIAL VEHICLE SAFETY ALLIANCE. ALL RIGHTS RESERVED.

1627